Renata ADLER, Plaintiff,

v.

The CONDE NAST PUBLICATIONS, INC., and Washington Communications Corporation, Defendants.

No. 84 Civ. 5801 (WK).

United States District Court, S.D. New York.

Sept. 29, 1986.

Memorandum and Order Oct. 15, 1986.

John Doar, New York City, for plaintiff.

James Rittinger, Satterlee & Stephens, New York City, for defendant Washington Communications Corp.

Caroll Neesemann, Parker, Auspitz, Neesemann & Delahanty P.C., New York City, for defendant The Conde Nast Publications, Inc.

**WHITMAN KNAPP, District Judge.**

Plaintiff Renata Adler brings this libel action against The Conde Nast Publications, Inc. ("Conde Nast"), publisher of *Vanity Fair* magazine, and Washington Communications Corporation, publisher of the *Washington Journalism Review* ("*The Review*"). The alleged libel was published in the September, 1983 issue of *The Review* in an article written by freelance writer Bruce Cook. The article, "Vanity Fair's Chaotic Comeback: Exit Richard Locke, Enter Leo Lerman" concerned Conde Nast's resurrection of *Vanity Fair* magazine. The following paragraph of that article was the only one to mention plaintiff, and is the subject of this lawsuit.

> If Leo Lerman looked like an interim appointee to some outsiders, that is not how he looked to the *Vanity Fair* staff. For one thing, he started firing people. Renata Adler was the first to go. Long with the *New Yorker*, she had been brought in by Richard Locke and held the title of consulting editor. It was a rather mysterious association, for in spite of her modest title, she had the power to assign and buy pieces. She raised some eyebrows around the office when she insisted on publishing a story of hers in the April issue, "Orcas Island," under the pseudonym, "Brett Daniels." It was clearly the work of the author of *Speedboat*, so why the pseudonym? Adding to the puzzle, the Knopf catalog appeared about the same time the story did, listing a new novel by Adler that made it clear even in brief summary that the story by "Brett Daniels" had been excerpted from the novel by Renata Adler. Whether or not Lerman objected to this sort of game-playing or felt that Adler was a luxury *Vanity Fair* could no longer afford is not known. But he discharged her, paid off authors of the pieces she had assigned and killed them.

Plaintiff claims that the article defamed her by falsely asserting that she was fired, which concededly she was not, for incompetence (buying and assigning pieces that were killed) and dishonesty (passing off her own work on the magazine as the work of another). She seeks $500,000 in compensatory and $500,000 in punitive damages from *The Review* and from Conde Nast, whose employees at *Vanity Fair* allegedly provided Cook with the defamatory information.

Accepting plaintiff's concession that the erroneous statement that she had been fired—standing alone—was not libelous, we previously ruled that it would be possible for one reading the article reasonably to conclude that plaintiff had been fired for professional misconduct, and that defendants were therefore not entitled to dismissal of the complaint for failure to state a claim upon which relief could be granted.

All discovery has now been completed and both defendants have moved for summary judgment. *The Review* claims that the facts establish that it acted neither with actual malice nor gross negligence in publishing the story. Conde Nast claims that no employee with authority to speak for it gave the claimed defamatory information to Cook and that the employee who did provide Cook with such information lacked the authority to bind the Company. It further contends that, in any event, such employee did not act with actual malice or even negligence.

For reasons that follow we grant the motion as to *The Review* but deny it as to Conde Nast, it appearing that a question of fact remains as to whether an agent of Conde Nast provided the article's author with libelous information.[1]

## FACTS

### 1. *The Plaintiff*

Renata Adler is an author of considerable renown who, throughout her career, has managed to create a substantial amount of controversy. She has been a writer and reviewer of movies for *The New Yorker* since 1962. She has also published

pieces and movie reviews in *The New York Times, Harper's Bazaar, The Atlantic, Commentary, The Village Voice, The National Review, The New York Times Book Review,* and *The New York Review of Books.* She is also the author of four books: two works of non-fiction and two novels. *Toward a Radical Middle* (1970) is a collection of plaintiff's pieces from *The New Yorker,* while *A Year in the Dark* (1971) is a collection of her movie reviews in *The New York Times.* Plaintiff's first novel, *Speedboat* (1976), won the Ernest Hemmingway award in 1977 for the best first novel by an American. Her second novel, *Pitch Dark,* was published in 1983.

Plaintiff's movie reviews have generated a great deal of controversy. In 1968, while she was a movie-reviewer for *The New York Times,* United Artists took out a full page advertisement in that newspaper which read as follows:

> Renata Adler, of The New York Times, did not like
> "In Cold Blood."

> She had reservations about
> "The Graduate."
> "Guess Who's Coming to Dinner?"
> "Planet of the Apes."

> We're not quite sure how she felt about
> "Bonnie and Clyde."

> The majority of other critics liked them.

> Most of all, the public likes them.

> Now she doesn't like

> "Here We Go Round the Mulberry Bush."

> What a recommendation!

Her review of "The Green Berets" was printed in the Congressional Record on June 26, 1968 and discussed on the floor of the United States Senate. In April, 1968 *Newsweek* ran a story entitled "Does She or Doesn't She?" that considered whether "the *Times'* No. 1 movie critic really hate[s] the movies?" *Variety,* the weekly newspaper covering the entertainment industry ran articles that included comments on Adler.

1. The parties have discussed at length the proper interpretation of the words in the paragraph and the truth or falsity of their claimed meaning. Having rules that the paragraph could be read in a defamatory way, we need not dwell upon this issue.

In 1976 Adler published a piece in *The Atlantic* entitled "Searching for the Real Nixon Scandal," in which she accused the former president of having accepted huge sums of money in illicit campaign contributions from the South Vietnamese government before the 1972 elections, in exchange for prolonging the war.

In the August 14, 1980 issue of *The New York Review of Books* Adler reviewed *When the Lights Go Down,* a collection of movie reviews by Pauline Kael of *The New Yorker.* Adler attacked Kael's work as "jarringly, piece-by-piece, line-by-line, and without interruption, worthless." Needless to say, this review of her colleague at *The New Yorker* created a great deal of controversy and received considerable media attention. For months after its publication articles appeared in, among other places, *The New York Times, The Washington Post, The Daily News, The Village Voice, New York Magazine* and *Time.*[2]

### 2. *Vanity Fair*

In mid–1981 Conde Nast began to explore resurrecting the old *Vanity Fair* magazine, which had last been published in 1936. Conde Nast devoted a year and a half to putting together a staff for the magazine and preparing once again to publish *Vanity Fair.* It spent approximately ten million dollars publicizing the new *Vanity Fair,* whose return was heralded nationwide in the print and broadcast media. Richard Locke, former editor of *The New York Times Book Review* was selected to be Editor-in-Chief. One of the people he hired in 1982 was the plaintiff Adler.

She was hired at an annual salary of $50,000 as "Consulting Editor." According to her affidavit (paragraphs 9 & 10) and her written contract with *Vanity Fair,* she was expected to come into the office about four times a month, usually the four days immediately prior to publication. Her principal functions were advisory in nature, but she also worked at attracting quality writers to the magazine. According to her affidavit (paragraph 14) she had "no power or authority whatsoever to assign or to buy pieces." She had neither an office nor a secretary at *Vanity Fair.* When her piece,

"Orcas Island," was published in *Vanity Fair*'s second issue (April, 1983), Locke knew that she was its true author, but Adler insisted on its being published under a pseudonym because she had previously decided that she would publish short fiction only under a pseudonym. Later she began work on the novel which became *Pitch Dark,* of which "Orcas Island" was the first chapter.

*Vanity Fair*'s first issue hit the streets in March, 1983 and was greeted with widespread critical condemnation. The fate of the new *Vanity Fair* continued to be a hotly-discussed topic for months after the first issue came out. On April 27, 1983 Locke was fired as Editor-in-Chief and replaced by Leo Lerman, causing *Vanity Fair* to receive still more press coverage.

Shortly after Lerman took over, Adler sought a new role for herself in the magazine which would give her considerably more involvement in editorial decision-making. According to her affidavit, she felt that she could no longer be associated with a publication that she felt was so poor. In fact, she discussed resigning with senior management at Conde Nast on more than one occasion. Eventually, after concluding that the terms she had proposed were not being met and that she no longer wished to remain at the magazine, she submitted her resignation on May 17, 1983. Her name appeared for the last time on the *Vanity Fair* masthead in its June, 1983 issue.

### 3. *Bruce Cook and The Review*

According to the affidavit of its editor, Katherine Winton Evans, *The Review* is a monthly magazine which focuses on the media. Its circulation in 1983 was 25,000, at which time it had an editorial staff of three persons. Most of its articles are written by freelance writers who are independent contractors. It carefully screens and selects its freelancers and only selects those in whose accuracy and reliability it has the utmost confidence. It does not have a policy of fact checking the substantive facts contained in its articles, in the absence of some particular reason for so doing, but relies on its writers to provide accurate facts. The only facts it checks

---

**2.** For purposes of ascertaining her status under the law of libel, we shall only discuss plaintiff's career up to the date of publication of the arti- cle in question. We recognize, however, that her more recent career would become relevant at any trial on the issue of damages.

are "technical" or "objective" facts, such as spellings of names, dates, titles, quotes from magazines, books or newspapers.

In February, 1983 Bruce Cook was recommended to Evans by her friend and colleague, Brigitte Weeks, editor of *The Washington Post's Book World* ("The Book World"). Weeks had published more than 60 book reviews by Cook in *The Book World* and had favorably reviewed several of his books. In Weeks' view, Cook was a thorough researcher and careful writer whose work could be depended upon for reliability and accuracy. She informed Evans that Cook was a writer who "does his homework" and would produce a piece that was "ready to go," i.e. not in need of much editing or checking. (Weeks affidavit at p. 2) Evans also learned from Weeks that Cook had worked as the book editor for *U.S.A. Today, The Detroit News* and *The National Observer.* Cook had also published five books and numerous freelance articles and was one of 24 Board Members of the National Book Critics Circle, which position Evans recognized as "a mark of the high regard in which he was held by his peers." (Evans affidavit at p. 5) [3]

After meeting and discussing Cook's background and the editorial needs of *The Review*, Evans and Cook agreed that Cook would do two pieces for it, the first would concern the book review sections of daily newspapers, a topic about which Cook had special expertise as a former book editor of three daily newspapers. The second was to be the article on *Vanity Fair.* Since Cook was friendly with a number of the *Vanity Fair* staff members through his directorship of the National Book Critics Circle, Evans felt confident that Cook would have excellent sources for this article as well.[4] The May, 1983 issue of *The Review* contained Cook's piece on book review sections, which piece was well-received.

In preparation for his *Vanity Fair* article, Cook came to its offices in the first week of July, 1983. *Vanity Fair* was anxious to have favorable publicity so Heather Collins, *Vanity Fair*'s publicity director, arranged for Cook to interview Editor-in-Chief Lerman. Both Cook and Lerman have testified that they did not discuss Renata Adler during this interview. Cook has also testified that at the time of his discussion with Lerman, he did not know that Adler was no longer at *Vanity Fair.* He had not yet seen the July issue, the first one in which Adler's name did not appear on the masthead.

A few days after speaking with Lerman, by which time Cook had read the July issue and knew that plaintiff was no longer on the masthead, Cook spoke by phone with editor Walter Clemons. Clemons, formerly (and presently) a Senior Writer and Book Reviewer for *Newsweek*, was an old friend of Cook's and was concededly the most senior and most experienced editor at *Vanity Fair.* Both Cook and Clemons have testified that substantially all of the material in the allegedly defamatory paragraph was supplied to Cook by Clemons during this interview. Clemons told Cook that Adler had been fired. (Clemons affidavit at paragraph 8.) At that time Clemons believed this to be true because (a) her name was no longer on the masthead and there had been no announcement regarding her departure, (b) Lerman had indicated to Clemons his displeasure at having to deal, after her departure, with pieces plaintiff had arranged for the magazine, (c) two other staff members had been fired at approximately the time plaintiff left, and (d) since Adler had been brought into the magazine by Locke, it seemed likely to Clemons that her departure was part of the fall-out following Locke's departure. Clemons also expressed to Cook his confusion about Adler's actual role with *Vanity Fair* and his belief that she had the power to assign and buy pieces for the magazine. He gathered the latter because Lerman had told him that although he would not run all the pieces Adler had purchased for the magazine, he would have to pay for them. Clemons also told Cook that he and others thought it odd that plaintiff would publish "Orcas Island" under a pseudonym when

---

**3.** The National Book Critics Circle has approximately 500 members. Membership on the 24 person Board is determined by vote of the entire membership.

**4.** *Vanity Fair*'s original editor Richard Locke, editors Walter Clemons (formerly *Newsweek*'s top book reviewer) and Elizabeth Pochoda (formerly literary editor of *The Nation*), and writer John Leonard (formerly editor of *The New York Times Book Review*) were all members of the National Book Critics Circle.

everyone on the staff at *Vanity Fair* knew that the story was written by her and when, not long after its publication, the fall 1983 catalogue of Alfred Knopf appeared, advertising Adler's new novel, of which "Orcas Island" was the first chapter. In sum, he believed that everything he told Cook —most of which Cook reported in the paragraph in question—was true, but some of which concededly turned out to be in error. Cook has testified that he relied on Clemons in writing the offending portion of his story.[5]

Late in July Evans received the *Vanity Fair* piece from Cook. In her affidavit Evans asserts that her reading of the article, which immediately pleased her, gave her no reason to suspect its accuracy. The upheaval at *Vanity Fair* following Locke's replacement by Lerman had been reported in other publications, and the firing of certain employees (not including plaintiff) had also been elsewhere reported. Further, Evans asserts that staff turnover is not uncommon following a change in a magazine's editorship, so although Evans had never read elsewhere of Adler's having been fired, she had no reason to suspect that it was not true.

Prior to publication, the article was edited by Evans, as well as by the managing editor and associate editor of the magazine, and the "technical" facts were checked by a student intern.

Cook's article was favorable to *Vanity Fair* and to its new editor, Lerman. After it came out *Vanity Fair*'s publicity department ordered a large number of reprints of the article to distribute to advertisers. Publisher Joseph E. Corr wrote a letter to Cook praising the piece. Lerman called Cook to congratulate him on having done such an excellent job. Both Lerman and Corr testified that at that time they did not discuss with Cook the paragraph about plaintiff.

Upon receiving a copy of the September issue of *The Review* plaintiff immediately called Evans and protested that the article had not accurately reported her departure from *Vanity Fair*. Although Evans then believed the article to be accurate and although the next issue of *The Review* was ready to go to press, she told plaintiff that she would arrange to have her dictate a letter to the editor setting forth her position. Plaintiff accepted this suggestion, and the letter she then dictated appeared (without modification) in the October issue. After learning that Cook's account of Adler's departure from *Vanity Fair* had in fact been in error, *The Review* offered to publish any retraction plaintiff might desire. Plaintiff, through counsel, rejected that offer and instead initiated this lawsuit.[6]

Plaintiff claims that Lerman, not Clemons, provided Cook with the false information about her departure from *Vanity Fair*. Richard Avedon, a well-known photographer who is friendly with both Adler and Lerman testified to a conversation he had with Lerman in which the following exchange took place.[7]

> ... I asked Leo—I remember it as being precise.
> "What happened about Renata?"
> "I fired her."
> "You mean you said that stuff?" or "you said that stuff to the Washington Journalism Review?"
> He said, "I had to." ...

Further, plaintiff points to Lerman's denials of having spoken to Cook about Adler in the original interview as evidence of a guilty conscience in light of the following evidence, which she claims indicates that Lerman did speak to Cook about Adler in that interview.

Adler claims that in a telephone conversation on October 8, 1983, Lerman told her

---

5. Cook also spoke to a number of other people at *Vanity Fair* while researching the piece, including editors Elizabeth Pochoda and Stephen Rubin, publisher Joseph Corr and writer John Leonard. None of those interviews are claimed to have any bearing on this lawsuit.

6. At oral argument plaintiff's counsel stated that she had declined that offer to avoid further attention from being drawn to the already-pub-

lished falsehood. This explanation seems to be undercut by her subsequent filing of this lawsuit.

7. At the time of this conversation Lerman was no longer Editor-in-Chief of *Vanity Fair*, but had assumed the position of Editorial Adviser for Conde Nast.

that he had spoken about her to Cook, but insisted that he had told Cook that she had resigned. Adler also claims that in a conversation of that same date with Alexander Liberman, editorial director of Conde Nast, Liberman told her that Lerman "says he only told him [Cook] that you resigned, and you did resign." (Adler affidavit at p. 22)

Lerman's phone messages for September 22 seem to indicate that Cook called him on that date and the call was marked "urgent" on Lerman's message sheet.

Jonathan Lieberson succeeded plaintiff as consulting editor at *Vanity Fair*. He testified to events which occurred on October 7, 1983 in a meeting he had with Leo Lerman. During this meeting Lerman accepted a call from Bruce Cook. At some point during the conversation Lerman said to Cook,

> I agree with you. I couldn't agree with you more. We must respond. We can't let her get away with this. It's very important for you and for me.

Thereafter Lerman agreed to meet with Cook on or about October 17, 1983, a meeting which apparently never took place.

## DISCUSSION

### 1. *Public Figure*

■ A plaintiff in a libel action who is a "public figure" must prove by clear and convincing evidence that the defendant acted with actual malice in publishing the defamatory falsehood. *Curtis Publishing v. Butts* and *Associated Press v. Walker* (1967) 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094. Actual malice is defined as "knowledge that [the statement] was false" or "reckless disregard of whether it was false or not." *New York Times v. Sullivan* (1964) 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686.[8]

In *Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 344, 94 S.Ct. 2997, 3009, 41

L.Ed.2d 789 the Court discussed the rationale underlying the distinction between public and private figures. First, public figures have "greater access to the channels of communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." *Id.* at 344, 94 S.Ct. at 3009. Second, public figures have assumed the risk that in the course of reporting and commenting on a public controversy, the press may inadvertently make erroneous statements about them. *Id.* at 344–345, 94 S.Ct. at 3009. Nonetheless, "absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life." *Id.* at 351–352, 94 S.Ct. at 3012–3013. For this reason, the Court went on to delineate two classes of public figures, all purpose public figures and limited purpose public figures, both of whom would have to prove "actual malice" in a defamation action. All purpose public figures have achieved "pervasive fame or notoriety." An individual may also "voluntarily inject himself or [be] drawn into a particular public controversy and thereby become a public figure for a limited range of issues." 418 U.S. at 351, 94 S.Ct. at 3012.

■ We find that Adler's general fame or notoriety in the literary and journalistic community and pervasive involvement in the affairs of society render her a public figure with regard to her activities relating to literature, journalism and criticism. The rationale of *Gertz* compels this conclusion. Plaintiff "enjoys significantly greater access to the channels of effective communication and hence [has] a more realistic opportunity to counteract false statements than private individuals normally enjoy." 418 U.S. at 344, 94 S.Ct. at 3009. Throughout her career her work has generated immense controversy, especially within the community to which the alleged libel was published. She has sought publicity for

8. If plaintiff is not a public figure, state law governs. *Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 347. Here New York law dictates that plaintiff would have to "establish that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." *Chapadeau v. Utica Observer-Dispatch, Inc.* (1975) 38 N.Y.2d 196, 199, 341 N.E.2d 569, 571, 379 N.Y. S.2d 61, 64.

her work and enjoyed ongoing access to the most widely read and respected periodicals in the nation. Her movie reviews, her piece about Nixon, and the review of Pauline Kael's book received such widespread media coverage that she must be deemed to have "invite[d] attention and comment." 418 U.S. at 345, 94 S.Ct. at 3009. She cannot now claim, with regard to an article concerning her activity as a writer/editor published in a magazine directed principally to persons interested in literary matters, that she is not a public figure.

In *Lerman v. Flynt Distributing Co., Inc.* (2d Cir.1984) 745 F.2d 123, 136–137 the Court of Appeals set forth a four part test to determine who is a "limited purpose public figure."

A defendant must show the plaintiff has: (1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media.

Plaintiff here has certainly invited public attention to her views prior to the incident which is the subject of this lawsuit and maintained regular and continuing access to the media. As was the difficulty in *Lerman,* the problem here is ascertaining whether Adler "injected herself into a 'public controversy' related to the offending publication." 745 F.2d at 137, and assumed a position of prominence with respect thereto. It is clear that a public controversy need not be a political issue. It is "any topic upon which sizeable segments of society have different strongly held views." *Id.*

The resurrection of *Vanity Fair* gave rise to a public controversy into which plaintiff injected herself and in which she played a prominent role. The revived *Vanity Fair* received enormous publicity even

prior to publication of its first issue. By offering her expertise and lending her name to the magazine for prominent display on its masthead under the title "Consulting Editor" in exchange for a not insignificant salary, plaintiff represented to the public that *Vanity Fair* would have the benefit of her considerable expertise and excellent reputation. In so doing, she injected herself into the *Vanity Fair* saga and any attendant controversy. Her very stature in the journalistic community would have made it impossible for her to resign— or to be fired—without such an act assuming a position of prominence within the controversy surrounding the early and turbulent months of *Vanity Fair.* [9]

### 2. *The Review*

The Supreme Court has recently held in *Anderson v. Liberty Lobby* (1986) —— U.S. ——, 106 S.Ct. 2505, 91 L.Ed.2d 202 that to defeat a motion for summary judgment in a libel case the plaintiff must show that the evidence, viewed in the light most favorable to plaintiff, is such that a reasonable jury might find that actual malice had been shown with convincing clarity. *See Yiamouyiannis v. Consumers Union of United States, Inc.* (2d Cir.1980) 619 F.2d 932, 940, cert. denied, (1980)·449 U.S. 839, 101 S.Ct. 117, 66 L.Ed.2d 46. Plaintiff has suggested no theory which would support such a finding with respect to *The Review.*

In order to hold *The Review* liable plaintiff must show with convincing clarity that its editors, or Cook if he was acting as its agent, acted with actual malice in publishing the paragraph in question.

The record fails to show evidence of anything approaching actual malice or even simple negligence on the part of Cook or *The Review* in preparation of the offending paragraph. Cook relied on Clemons and perhaps Lerman in preparing the statements about Adler. Cook had no reason to doubt either one, both of whom were highly placed employees of *Vanity Fair* with no perceptible axe to grind with Adler. Likewise, *The Review* had no reason not to

---

**9.** Other individuals with considerably less notoriety than plaintiff have been held to be limited purpose public figures. *Lerman, supra.,* 745 F.2d 123 (author of sexually explicit books and social critic of sexual mores); *Maule v. NYM Corp.* (1981) 54 N.Y.2d 880, 444 N.Y.S.2d 909, 429 N.E.2d 416 (writer for *Sports Illustrated*); *Atkins v. Friedman* (1st Dept.1975) 49 A.D.2d 852, 374 N.Y.S.2d 11 (physician who wrote books on dieting).

rely upon Cook. He came highly recommended, with excellent credentials, and had already done one good piece for *The Review*. Further, the information he submitted regarding plaintiff was extremely plausible, given the upheaval at *Vanity Fair*. While plaintiff contends that *The Review*'s fact-checking procedures were inadequate, we do not so find. We believe that the first amendment requires that editors of a small publication be permitted to rely on the wholly plausible factual representations of writers whom they have reason to believe are professional, reliable, and who possess highly-placed sources for the information reported. Since we are satisfied that there is no evidence whatever of actual malice (or even negligence) on the part of Cook or of any other person associated with *The Review*, we don't reach the question of whether or not Cook, as a freelance writer, was its agent.

### 3. *Conde Nast*

■ With respect to Conde Nast the real problem is to determine precisely what the Supreme Court meant by its ruling in *Anderson v. Liberty Lobby, supra*, that malice must be established by "clear and convincing evidence." If the Court meant that the underlying facts upon which the inference of malice was to be drawn must be so established, Conde Nast would surely be entitled to summary judgment. The facts upon which plaintiff seeks to base the inference that Lerman provided Cook with the defamatory information are tenuous at best, while the contrary evidence seems substantial. If, on the other hand, the Court meant only that it must be possible "clearly and convincingly" to draw an inference of malice from facts which the jury was entitled to find by ordinary evidentiary rules, then plaintiff must prevail on this motion. We conclude that the latter rule is the correct one.

In *Anderson* the Court stated that "Our holding that the clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions does not denigrate the role of the jury ... The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." —— U.S. at ——, 106 S.Ct. at 2513, 91 L.Ed.2d at 216. In *Yiamouyiannis v. Consumers Union of United States*, 619 F.2d at 940 (cited with approval by the Court in *Anderson*) the Court of Appeals stated that "a judge in denying a defendant's summary judgment motion must conclude that, based on the evidence asserted in the plaintiff's affidavits, 'a reasonable jury *could* find malice with convincing clarity.'" Quoting *Nader v. de Toledano* (D.C.1979) 408 A.2d 31, 50, *cert. denied* (1980) 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (emphasis in original).

Applying these rules to the situation at bar, it is clear that based on the evidence presented by plaintiff, we must find that a question of fact has been presented as to whether 1) Lerman had told Cook that he had fired plaintiff and 2) he accused her of incompetence in having bought unusable material.[10] Avedon's testimony as well as the conflicting testimony about whether Lerman in fact ever spoke to Cook about Adler and, if so, why he later denied it, raise such a question of fact. Should the jury find these facts in plaintiff's favor, a finding of actual malice would almost inevitably follow. By hypothesis Lerman knew that he had not fired plaintiff, and it is highly improbable that he did not know whether or not she had purchased unusable material. Accordingly, a jury could find actual malice with convincing clarity, and Conde Nast's motion must be denied.[11]

### CONCLUSION

In sum, plaintiff has presented sufficient evidence to avoid summary judgment as to

**10.** No question is presented by plaintiff's claim that the article accused her of dishonesty in using a pseudonym. It is conceded that she did publish under a pseudonym. Whether that constituted dishonesty is a matter of opinion.

**11.** Plaintiff argues that Clemons, as Conde Nast's authorized agent, could also cause it to be liable should a jury find that he made the state-

ments. We disagree. Even assuming that Clemons was Conde Nast's agent, plaintiff has failed to offer any evidence that Clemons acted with any suspicion that the information he was providing to Cook was incorrect. To the contrary, Clemons' affidavit sets forth in detail his reasonable grounds for believing that his statements about Adler were true.

Conde Nast. Accordingly, the motion of defendant Conde Nast is denied. The motion of defendant Washington Communications Corporation is granted and the complaint, as to it, is hereby dismissed.

SO ORDERED.

### MEMORANDUM & ORDER

Defendant Conde Nast moves for reconsideration of our decision of September 29, 1986 or, in the alternative, for certification pursuant to 28 U.S.C. § 1292(b) of the question whether we have accurately interpreted the Supreme Court's recent decision in *Anderson v. Liberty Lobby, Inc.* (1986) —— U.S. ——, 106 S.Ct. 2505, 91 L.Ed.2d 202. In light of the strong first amendment policy in favor of disposing of libel actions without trial, where such disposition is appropriate, and in light of the overall weakness of plaintiff's case, as noted in our opinion, we believe that defendant Conde Nast's application for a certificate has merit.

We accordingly find that the proper interpretation of the Supreme Court's recent decision in *Anderson* presents a controlling question of law as to which there is substantial ground for difference of opinion. In view of the fact that a reversal of our decision would finally end the matter and obviate the need for a trial, it is obvious that an interlocutory appeal might materially advance the ultimate termination of the litigation.

Should the Court of Appeals accept this appeal by Conde Nast, we would forthwith amend our judgment dismissing plaintiff's complaint against defendant Washington Communications Corporation pursuant to 28 U.S.C. § 1292(b) to permit an immediate appeal by plaintiff, so that the entire controversy could be decided by the Court of Appeals at one time.

SO ORDERED.