Joseph F. FALLS, Plaintiff,

v.

The SPORTING NEWS PUBLISHING COMPANY, et al., Defendants.

Civ. A. No. 86–CV–60551–AA.

United States District Court, E.D. Michigan, S.D.

April 6, 1989.

---

### ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

LA PLATA, District Judge.

On January 31, 1986, Plaintiff, Joseph F. Falls, instituted this action against Defendants, The Sporting News Publishing Company, Richard Waters and Tom Barnidge, alleging age discrimination, defamation and injurious falsehood. After brief discovery, Defendants moved for summary judgment. On May 22, 1986, this Court granted Defendants' motion for summary judgment ("Initial Summary Judgment"). Plaintiff appealed from the order granting the Initial Summary Judgment; the Sixth Circuit Court of Appeals vacated the Initial Summary Judgment and remanded the case for further proceedings. The action is currently before the Court on Defendants' renewed Motion for Summary Judgment.

When he filed his complaint, Plaintiff was fifty-seven years old and had been a sports writer for over thirty-five years. Plaintiff was sports editor of *The Detroit News* and, from 1963 until 1985, he contributed a weekly column to *The Sporting News* ("TSN"). In June 1985, Defendant Tom Barnidge, TSN's editor discharged Plaintiff.

### I. AGE DISCRIMINATION

Plaintiff's age discrimination claim is based upon the Elliott–Larsen Civil Rights Act, M.C.L.A. § 37.2101 *et seq.* ("Elliott–Larsen Act"). On appeal of the Initial Summary Judgment, the Sixth Circuit affirmed this Court's conclusion that coverage under the Elliott–Larsen Act is limited to employees and does not extend to independent contractors. *Falls v. Sporting News Pub. Co.*, 834 F.2d 611, 613 (6th Cir.1987). Thus, the dispositive inquiry for

purposes of this Motion is whether Plaintiff was an employee of TSN under the "economic reality" test. See *Falls* at 614.

■ The economic reality test looks to the totality of the circumstances surrounding the work performed. *Wells v. Firestone Tire and Rubber Co.*, 364 N.W.2d 670, 673 (1984). A finding of an independent contractor relationship must be based upon a "convincing accumulation of factors indicating that [P]laintiff's services were rendered in the course of his pursuit of his separate business enterprise of selling those services." *Falls* at 614. Factors to be considered are control of the worker's duties, payment of wages, authority to hire and fire, and responsibility for the maintenance of discipline. *Id.* Additionally, the Court must consider whether the duties performed by Plaintiff were an integral part of TSN's business and contributed to the accomplishment of a common objective. *Askew v. Macomber*, 247 N.W.2d 288, 290 (1976).

■ As mentioned above, control of Plaintiff's duties is a relevant factor for purposes of determining whether he was a TSN employee or an independent contractor. For purposes of the economic realities test, the question is not whether TSN in fact exercised control over Plaintiff's duties but rather, whether TSN had the right to do so. See *Hyslop v. Klein*, 85 Mich.App. 149, 270 N.W.2d 540, 544 (1978). Defendants argue that because TSN did not control the time, location or manner in which Plaintiff gathered news and wrote his column, TSN did not control Plaintiff's duties. In response, Plaintiff asserts that TSN had the right to and on occasion did edit his work and requested that he write on a specific topic; further, Plaintiff's columns were submitted pursuant to a TSN deadline. Viewing the facts in the light most favorable to the Plaintiff for purposes of this Motion, the Court will assume that TSN had the right to exercise control over Plaintiff's duties.

Next, the Court must consider whether the duties performed by Plaintiff were an integral part of TSN's business and contributed to the accomplishment of a common goal. *Hyslop* 270 N.W.2d at 542. Defendants argue that Plaintiff's column for TSN which was typically less than a quarter of one page in TSN's weekly magazine of approximately 80 pages was "certainly not 'integral' to the success of the magazine." Defendants' focus on this issue is misplaced. Plaintiff's column does not have to be integral to the business success of TSN under this factor of the economic reality test. TSN's business is to publish a weekly sports magazine. Plaintiff, along with many other sports writers and columnists, submitted sports columns to TSN, without which, there would be no magazine. It is clear that Plaintiff's work was an integral part of TSN's business.

In deposition, Plaintiff indicated that for the past ten years, he has been employed as a full-time columnist for *The Detroit News* and for the past eight years, he has been a Sports Editor there. Prior to employment with *The Detroit News*, Plaintiff held similar positions as baseball writer, columnist and Sports Editor with *The Detroit Free Press*. Plaintiff writes between five and twenty one columns per week for *The Detroit News* and devotes an average of more than eight hours a day to his job responsibilities at *The Detroit News*. In 1978, when Plaintiff was hired by *The Detroit News*, his salary was $40,000.00; that salary has steadily grown to $89,000.00. Plaintiff indicated that his income from *The Detroit News* is his primary source of support. Finally, Plaintiff also received extensive employee benefits from *The Detroit News*, including hospitalization, dental and health insurance, retirement benefits, four weeks paid vacation, sick days, office space and reimbursement for travel expenses.

By contrast, Plaintiff spent approximately one hour per week actually writing the columns which he submitted to TSN. Since 1982, Plaintiff was paid $90.00 per column written for TSN and additional pay for any stories written in addition to his column. Total income Plaintiff received from TSN was $4,095.50 in 1982, $4,590.00 in 1983, $4,520.00 in 1984 and $2,160.00 in 1985. Plaintiff did not receive employee benefits from TSN such as hospitalization, dental or

health insurance, retirement benefits, office space, vacation pay or reimbursement for travel expenses. TSN did not furnish Plaintiff with equipment such as a typewriter, pencils, paper, notebooks, word processor, office space or secretarial assistance. Further, Plaintiff's income from TSN was reported on Internal Revenue Service Form 1099 and TSN did not deduct employee withholding taxes or Social Security Taxes from Plaintiff's income.

Finally, Plaintiff indicated that in his field, sports writers and columnists commonly submit contributions to publishers or media outlets other than their primary employer and that over the years, he has been successful in offering his sports writing talents to a number of media outlets other than his primary employers, *The Detroit News* and *The Detroit Free Press*. In addition to his full-time employment with *The Detroit News*, during recent years Falls has: (1) given daily radio commentaries for WWJ, had an out-of-state radio show and made numerous television appearances; (2) written several books; (3) published "countless articles"; (4) submitted articles to other publications, including TSN, *Athlon Publications, The Hockey News, Baseball Bulletin, Yankee Magazine, Philadelphia Flyer's Magazine, Friend's Magazine* and *Sports Illustrated;* and (5) made numerous speaking and personal appearances.

Based upon a review of the totality of the circumstances surrounding Plaintiff's work with TSN, the Court concludes that Plaintiff had an independent contractor relationship with TSN. Consequently, Plaintiff cannot maintain an age discrimination claim based upon the Elliott–Larsen Act.

## II. DEFAMATION

Plaintiff claims that he was defamed by TSN's editor, Defendant Tom Barnidge. In a letter responding to a reader's inquiry, Barnidge wrote: "I know Joe brightened a lot of hearts with his column through the years but we felt it was time to make a change, with more energetic columnists who attend more events and are closer to today's sports scene." Plaintiff also claims

that he was defamed by Defendant Richard Waters, TSN's president. Waters was quoted in the September 17, 1985 edition of *USA Today* as saying that: "Those who seem to have reached maturity and are on the downswing are giving way to some of the up-and-coming young writers who we think deserve a chance."

In Defendants' original Motion for Summary Judgment, they took the position that their statements are privileged under the First Amendment as opinions. Defendants also claimed that the statements fall under the common law fair comment privilege. In light of the Sixth Circuit's opinion, in this Motion, Defendants assume that the allegedly defamatory statements were statements of fact. Defendants argue that Plaintiff was a "public figure" for purposes of the rule established in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and that Plaintiff is unable to establish by "clear and convincing" proof that defamatory falsehoods were published about him with knowledge of their falsity or conscious awareness of probable falsity. In response, Plaintiff argues that he is not a public figure for purposes of the *New York Times* rule and, even if he is a "public figure", Defendants knew their statements were false or acted with reckless disregard of the falsity of the statements.

In *New York Times Co. v. Sullivan,* the Supreme Court held that in a libel suit brought by a public official, the First Amendment requires the plaintiff to establish that in publishing the defamatory statement the defendant acted with "actual malice", that is "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times,* 84 S.Ct. at 725–726. In *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), the *New York Times* actual malice standard was extended to libel suits brought by public figures as well.

Classification of a plaintiff as a public or private figure is a question of law to be determined by the trial court. *Marcone v. Penthouse Intern. Magazine for*

*Men,* 754 F.2d 1072, 1081 n. 4 (3d Cir.) *cert. denied,* 474 U.S. 864, 106 S.Ct. 182, 88 L.Ed.2d 151 (1985). There are two classes of public figures: all purpose public figures and limited purpose public figures. *Marcone* at 1082. In the first category are people that have achieved "such pervasive fame or notoriety that [they become] a public figure for all purposes and in all contexts." *Marcone* at 1082, *citing Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 3013, 41 L.Ed.2d 789 (1974). A limited purpose public figure is "an individual [who] voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Gertz,* 94 S.Ct. at 3013. "From the voluntary act is derived the notion of assumption of the risk and the consequent fairness of in labelling the person a public figure." *Marcone* at 1083. In a typical limited purpose public figure case, the "plaintiff actively participates in the public issue in a manner intended to obtain attention." *Id.* For example, an agent who holds news conferences to attract media attention for himself and his client is a public figure in that context. *Woy v. Turner,* 573 F.Supp. 35 (N.D.Ga. 1983). Similarly, sports figures are generally considered public figures because of their position as athletes or coaches. *Marcone* at 1083.

■ Based upon a review of the record it is clear that Plaintiff is a public figure with regard to his sports writing activities. See *Adler v. Conde Nast Publications, Inc.,* 643 F.Supp. 1558, 1564 (S.D.N.Y.1986). By virtue of the fact that Plaintiff has been a sports writer for national publications, given radio shows and made television appearances, written books and made many speaking and personal appearances, Plaintiff has voluntarily thrust himself into the public eye within the meaning of *Gertz.* As a successful journalist, Plaintiff enjoys "significantly greater access to the channels of effective communication and hence [has] a more realistic opportunity to coun-

teract false statements than private individuals normally enjoy." *Gertz,* 94 S.Ct. at 3009.

In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Supreme Court held that in determining a motion for summary judgment in a libel suit brought by a public figure, the trial judge must bear in mind the actual quantum and quality of proof necessary to support liability under *New York Times.* Thus, this Court must determine whether evidence presented by Plaintiff in opposition to this Motion is of sufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence. *Anderson* 106 S.Ct. at 2513. As discussed earlier, "actual malice" is defined as "knowledge that [the statement] was false" or "reckless disregard of whether it was false or not." *New York Times* at 726. Finally, for purposes of deciding this Motion, evidence of the non-movant is to be believed and all justifiable inferences to be drawn in his favor. *Anderson,* 106 S.Ct. at 2513.

■ In support of their Motion, Defendants Barnidge and Waters submitted affidavits stating that they believed that their statements about Plaintiff were true.[1] In support of his position that Defendant Barnidge's statement was made with actual malice, Plaintiff asserts that:

In his deposition, Barnidge admitted that he knew that Plaintiff traveled extensively in connection with his position as Sports Editor of *The Detroit News,* that he could not recall any specific sporting events that Plaintiff should have covered, but did not, that his problems with Plaintiff's writing was one of 'intellectual industry' rather than 'physical industry', that he could not think of any specific sports figures that Plaintiff should have been in touch with, but was not, and that he did not feel that Plaintiff was 'too old to get up in the morning and do his job.' With regard to the decision

1. The affidavit of Tom Barnidge, dated April 3, 1986, stated: "That at no time did I believe that any comment made therein by me was untrue, nor did I act recklessly with respect thereto."

The affidavit of Richard Waters, dated April 4, 1986, indicates that he earnestly held the belief that Plaintiff's columns were "on the downswing."

to terminate, Barnidge stated that 'the number of events that he covered or the location of them had absolutely no bearing on my decision.'

As to the replacement columnists, Barnidge admitted that he did not know if they had contacts within the sports world that Plaintiff did not have, and that he had no numerical evidence that they attended more events that Plaintiff. (citations omitted).

Plaintiff concludes that "these admissions raise a genuine issue of fact as to whether Barnidge knew that his response to the letter was false, or acted with reckless disregard to the truth." Based upon a careful review of the deposition testimony cited by Plaintiff, the Court disagrees with Plaintiff's summary of Defendant Barnidge's deposition testimony.[2] Even if all justifiable inferences are drawn in his favor, the testimony cited by Plaintiff is not sufficient to raise a genuine issue of fact regarding whether Barnidge's statements were made with actual malice. See *Anderson* at 2513. As to Defendant Waters, Plaintiff does not offer any evidence to show that Water's statement was made with actual malice. Consequently, summary judgment is appropriate as to both Defendants.

### III.  INJURIOUS FALSEHOOD

 On appeal, the Sixth Circuit discussed the tort of injurious falsehood. *Falls* at 616–17. The Court noted that special damages in the form of pecuniary loss must be pleaded and proved. *Id.* Because Plaintiff's complaint did not allege that Defendants' conduct interfered with a specific relationship between Plaintiff and a third party which resulted in pecuniary loss, the Court indicated that "upon remand, plaintiff should be afforded the opportunity to properly plead and prove this tort." *Id.* To date, Plaintiff has not sought to amend his complaint. Thus, De-

fendants' Motion for Summary Judgment is granted as to this claim also.

### IV.  CONCLUSION

For the above reasons, Defendants' Motion for Summary Judgment is GRANTED.

---

**2.**  For example:

Q.  You further say, 'Verdi, Gergen and Downey attend more events.'

What events did they attend that were more than what Joe Falls had attended?

A.  I guess again this is my impression. It's my opinion, and I cannot give you numerical numbers as to how many events they attend or why there are more. Joe Gergen goes to the Final Four every year. I've never seen Joe Falls at the Final Four. Is that a specific?