899 F.2d 1221
 52 Fair Empl.Prac.Cas. 1772, 17 Media L. Rep. 1742
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Joseph F. FALLS, Plaintiff-Appellant,
v.
THE SPORTING NEWS PUBLISHING COMPANY, Richard Waters and Tom
Barnidge, Defendants-Appellees.
 No. 89-1543.
 United States Court of Appeals, Sixth Circuit.
 April 10, 1990.
 
 Before DAVID A. NELSON and ALAN E. NORRIS, Circuit Judges, and GEORGE CLIFTON EDWARDS, Jr., Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Plaintiff Joseph F. Falls, a sportswriter, appeals from an order granting summary judgment to the defendants in this diversity action brought under Michigan law for wrongful discharge and defamation. The district court found that the plaintiff was an independent contractor and thus lacked the rights that he would have had as an employee. The court found further that the plaintiff is a public figure and could not show that the defendants made false statements about him knowingly or recklessly. The plaintiff argues that genuine issues of fact exist as to all of these matters. We disagree, and we shall affirm the judgment of the district court.
 
 
 2
 * At the time he commenced this suit Mr. Falls was 57 years old. He had been a sportswriter for over 35 years, and he had risen to the position of sports editor of The Detroit News.
 
 
 3
 In 1963, as a sideline, Mr. Falls began writing a weekly column for another paper, The Sporting News, which is published by defendant Sporting News Publishing Co. That relationship existed until June of 1985, when defendant Tom Barnidge, The Sporting News' then-new 37-year-old editor, terminated it. Mr. Barnidge allegedly told Mr. Falls that he "no longer fit our image." Sporting News discharged two other older columnists at the same time and hired three younger ones.
 
 
 4
 On June 19, 1985, in response to a reader's letter expressing displeasure with the dropping of Mr. Falls' column, Editor Barnidge wrote that "I know that Joe brightened a lot of hearts with his column through the years but we felt it was time to make a change, with more energetic columnists who attend more events and are closer to today's sports scene."
 
 
 5
 In a September 17, 1985, sports page "cover story" in USA Today discussing the changes at The Sporting News, defendant Richard Waters, president and chief executive officer of Sporting News, was quoted as saying that "[t]hose who seem to have reached maturity and are on the downswing are giving way to some of the up-and-coming young writers who we think deserve a chance." These two statements form the basis for the defamation claim.
 
 
 6
 Mr. Falls filed a timely federal court action charging age discrimination in violation of Michigan's Elliot-Larsen Civil Rights Act, Mich.Comp. Laws Secs. 37.2101, et seq.; intentional, reckless, and negligent defamation; and knowing or reckless injurious falsehood. Without answering the complaint, the defendants moved for summary judgment. The district court granted the motion, finding (a) that Mr. Falls was an independent contractor not protected under Elliot-Larsen, and (b) that the statements were privileged opinions.
 
 
 7
 This court vacated the judgment and remanded the case. Falls v. Sporting News Publishing Co., 834 F.2d 611 (6th Cir.1987). We expressed concern about the granting of summary judgment on the age discrimination count while discovery was still pending, and we observed that it was not clear what test the district court had used in finding that the plaintiff was an independent contractor. Id. at 614. We rejected the district court's finding that the statements of Messers. Barnidge and Waters were protected opinions. Id. at 614-16. We remanded the injurious falsehood claim so that the plaintiff would have an opportunity to amend his pleadings and attempt to prove the elements of the tort. Id. at 617.
 
 
 8
 After the completion of discovery, defendants again moved for summary judgment. Again the motion was granted. Falls v. Sporting News Publishing Co., 714 F.Supp. 843 (E.D.Mich.1989). The district court undertook an exhaustive analysis of the factors bearing on whether an individual is an independent contractor, and found that this was what the plaintiff was. Id. at 844-46. The court went on to hold that the plaintiff was a public figure, and that on the uncontested facts no inference could be drawn that the statements were made with knowing or reckless disregard for the truth. Id. at 846-48. The court noted that plaintiff did not amend his complaint to allege the elements of injurious falsehood, and it granted summary judgment to the defendants in all respects. Id. at 848.
 
 II
 
 9
 Whether one is an employee or independent contractor under Michigan law depends, as the district court correctly noted, on "economic reality." Wells v. Firestone Tire and Rubber Co., 421 Mich. 641, 364 N.W.2d 670 (1984). As we have noted previously in this case,
 
 
 10
 "Control of the worker's duties, payment of wages, authority to hire and fire, and responsibility for the maintenance of discipline, are all factors to be considered, but no one factor is controlling.... Whether TSN was plaintiff's employer, then, will depend upon the economic realities of their relationship, and among the relevant factors that will demonstrate an employment relationship are those listed above, as well as whether the duties performed by plaintiff were an integral part of TSN's business and contributed to the accomplishment of a common goal.... Establishment of an independent contractor relationship would require a convincing accumulation of factors indicating that plaintiff's services were rendered in the course of his pursuit of his separate business enterprise of selling those services." 834 F.2d at 614 (citations omitted).
 
 
 11
 The district court found, and we agree, that the plaintiff's work was integral to the success of The Sporting News. See 714 F.Supp. at 845. The issue is not, as defendants urge, whether the plaintiff is personally integral to the organization's success. Very few employees are so key that their employers could not function without them. The issue is whether the type of work done by the individual is integral to the success of the organization. Here Mr. Falls worked as a writer. Without written stories, there could be no Sporting News.
 
 
 12
 The district court also found that Sporting News exercised control over the plaintiff's work. This finding is more problematical, in our view. The defendants certainly had the right to edit the plaintiff's columns, and they sometimes asked him to write on a general topic such as the Super Bowl or the World Series. But Mr. Falls usually could write on any topic he wished, and even when given a general topic he could pick any aspect of that topic. Mr. Falls was not the type of writer-employee who is assigned a team or a sport and told how to cover it.
 
 
 13
 Regardless of how the question of control is resolved, however, we agree with the district court that the financial arrangements under which Mr. Falls wrote for The Sporting News militate strongly in favor of the conclusion that he was an independent contractor. Mr. Falls received $90 per column, which came to over $4,000 per year. If he did not produce a column, he did not get paid for it. His salary at The Detroit News was $89,000 per annum. The Detroit News paid all of Mr. Falls' fringe benefits; Sporting News paid none. Sporting News paid none of Mr. Falls' expenses, and he deducted his expenses on his income tax returns. His receipts from Sporting News were reported not on a W-2 employee form, but on a Form 1099 (miscellaneous receipts), with no withholding and no social security deductions. His own returns listed his Sporting News receipts on Schedule C, which is used for income from sole-proprietorship businesses or professions. Mr. Falls' own tax returns indicate that The Detroit News was his only employer.
 
 
 14
 It is true that Sporting News paid Mr. Falls for every column he turned in, whether the column was run or not. But the more significant fact is that he was paid only when he produced a column. Once the column became the property of Sporting News, the publication could do with it what it pleased. The Detroit News, by contrast, paid Mr. Falls the same amount every week, even though his output (which ranged between 5 and 21 columns per week) was far from constant. It is clear from the undisputed facts that Mr. Falls was merely doing piecework for Sporting News. No rational jury could find otherwise, and summary judgment was therefore appropriate. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).
 
 III
 
 15
 We turn now to Mr. Falls' defamation claim. If the plaintiff is a public figure, he must establish by clear and convincing proof that the defamatory statements were made with knowing or reckless disregard for their truth. New York Times Co. v. Sullivan, 376 U.S. 254 (1964). Under Michigan law, if the plaintiff is a private person, the statements must have been made negligently at least. Ledl v. Quik Pik Food Stores, Inc., 133 Mich.App. 583, 349 N.W.2d 529 (1984) (per curiam).
 
 
 16
 The United States Supreme Court has defined two classes of public figures:
 
 
 17
 "For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment." Gertz v. Robert Welch, Inc., 418 U.S. 323, 345 (1974).
 
 
 18
 Whether one is a public figure is a question of law to be determined by the courts. Marcone v. Penthouse Intern. Magazine for Men, 754 F.2d 1072, 1081 n. 4 (3d Cir.), cert. denied, 474 U.S. 864 (1985); Rebozo v. Washington Post Co., 637 F.2d 375, 379 (5th Cir. Feb.1981), cert. denied, 454 U.S. 964 (1981); Waldbaum v. Fairchild Publications, Inc., 627 F.2d 1287, 1293 n. 12 (D.C.Cir.), cert. denied, 449 U.S. 898 (1980). The district court found that Mr. Falls "is a public figure with regard to his sports writing activities." 714 F.Supp. at 847; accord Adler v. Conde Nast Publications, Inc., 643 F.Supp. 1558, 1564-65 (S.D.N.Y.1986) (finding writer Renata Adler a public figure with regard to her activities relating to literature, journalism, and criticism).
 
 
 19
 The plaintiff argues that he is not a public figure because he did not thrust himself into a controversy over his firing. This is not the test. The real question is whether Mr. Falls' career as a sportswriter made him a public figure for purposes of commentary on him as a sportswriter. Mr. Falls did choose to thrust his writing into the public eye, and he did "enjoy significantly greater access to the channels of effective communication and hence had a more realistic opportunity to counteract false statements than private individuals normally enjoy." Gertz, 418 U.S. at 344. According to the USA Today story, The Sporting News had a circulation of 700,000 in 1985. Given his weekly appearances before an audience of that size, Mr. Falls cannot persuasively claim to be a private figure.
 
 
 20
 That being so, we must determine whether a reasonable jury could find, by clear and convincing evidence, that the defendants made the statements with "actual malice"--i.e., while realizing the statements were false or while subjectively entertaining serious doubt as to their truth. See Anderson, 477 U.S. at 251-52; Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 511 n. 30 (1984).
 
 
 21
 Pointing to Mr. Waters' deposition testimony that he read the plaintiff's column only four or five times a year for four years, Mr. Falls argues that "Waters had an insufficient base upon which to construct any objective analysis of whether Plaintiff was 'past his peak' as a writer." The issue, however, is not whether Mr. Waters had a sufficient objective basis for making the remark, but whether he really entertained serious doubt about its truth. Mr. Waters testified that he found Mr. Falls' columns increasingly boring; there is no evidence to the contrary.
 
 
 22
 As to Mr. Barnidge's statement regarding "more energetic columnists who attend more events and are closer to today's sports scene," the plaintiff points to several parts of Mr. Barnidge's deposition testimony to support his claim of actual malice. Mr. Barnidge said he knew that Mr. Falls traveled extensively in connection with his job as sports editor of The Detroit News; that he could not recall any specific sporting events that Mr. Falls should have covered but did not; that his problem with Mr. Falls' writing was one of "intellectual industry" rather than "physical industry;" that he could not think of any specific sports figures with whom Mr. Falls should have been in touch, but was not; and that he did not feel that Mr. Falls was "too old to get up in the morning and do his job." With regard to the decision to drop Mr. Falls' column, Mr. Barnidge said that "[t]he number of events that he covered or the location of them had absolutely no bearing on my decision." As to the replacement columnists, Mr. Barnidge said he did not know if they had contacts within the sports world that Mr. Falls did not have and he had no numerical evidence that they attended more events that Mr. Falls. On the other hand, as noted by the district court, the following exchange did occur:
 
 
 23
 "Q: You further say, 'Verdi, Gergen and Downey [the replacement columnists] attend more events.'
 
 
 24
 What events did they attend that were more than what Joe Falls had attended?
 
 
 25
 A. I guess again this is my impression. It's my opinion, and I cannot give you numerical numbers as to how many events they attend or why there are more. Joe Gergen goes to the Final Four every year. I've never seen Joe Falls at the Final Four. Is that a specific?
 
 
 26
 Q: That gives me a specific. Anything other than the Final Four that you know of that those three attended that in your opinion made you feel they attended more events?
 
 
 27
 A: Again it was the material that they produced as a result of attending events and interviewing athletes, being on the scene that impressed me."
 
 
 28
 As with Mr. Waters, the most that can be said is that the remarks were ill-considered, lacked a reasonable basis in fact, and were negligently made. Unprofessional terminology and an intemperate tone do not satisfy the actual malice standard. Lins v. Evening News Ass'n, 129 Mich.App. 419, 436, 342 N.W.2d 573, 582 (1983). The plaintiff himself testified that he knew of no facts that would demonstrate that the defendants made false statements about him with actual malice:
 
 
 29
 "Q.: Are there any facts or reasons that you know of that would lead you to conclude or that you know of as to why those men would have lied about you or your column writing ability?
 
 
 30
 A.: Again, we are talking about opinion and what is subjective and I can argue with them. I am not calling them liars. I'm just saying that they said what they said and it defamed me. I felt very embarrassed by it."
 
 
 31
 Mr. Falls also testified that he knew of no facts that suggested to him that the defendants were expressing anything other than honestly held beliefs about his writing.
 
 
 32
 There is no evidence that Mr. Barnidge entertained serious doubts about the truth of what he said. No reasonable jury could find clear and convincing evidence of actual malice by either Mr. Barnidge or Mr. Waters, and therefore summary judgment was appropriate. See Anderson, 477 U.S. at 256-57.
 
 
 33
 The judgment of the district court is AFFIRMED.