2005 UT 25

**Holly WAYMENT, Plaintiff and Appellant,**

v.

**CLEAR CHANNEL BROADCASTING, INC., a Texas corporation dba KTVX Channel 4, and Jon Fischer, and Patrick Benedict, individuals, Defendants and Appellees.**

No. 20030854.

Supreme Court of Utah.

April 15, 2005.

Elizabeth King Burgess, Don L. Davis, Robert C. Alden, Derek L. Davis, Salt Lake City, for plaintiff.

Randy L. Dryer, Sean D. Reyes, Salt Lake City, for defendants.

DURHAM, Chief Justice:

¶ 1 This case concerns a defamation claim brought by a reporter against her former employer, the owner of a local television station, regarding statements allegedly made about the reasons for her departure from the company. In reviewing the order of the district court, which granted summary judgment to the employer, we must decide whether the reporter qualifies as a "public figure," entitling her employer to heightened First Amendment protection with regard to the allegedly defamatory statements about her. We must also determine whether the reporter submitted sufficient evidence on summary judgment that the employer actually made any of these statements. In addition, the employer raises the qualified privilege accorded employer-employee communications as an alternative ground for affirmance.

¶ 2 We hold that the reporter does not qualify as a public figure under the circumstances of this case. We affirm summary judgment for the employer with respect to the statements allegedly made by one of its agents, Jon Fischer. However, we reverse and remand with respect to the statements allegedly made by another of its agents, Patrick Benedict.

## BACKGROUND

¶ 3 When reviewing a district court's grant of summary judgment, "we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party," here, the plaintiff. *Nyman v. Anchor Dev., L.L.C.*, 2003 UT 27, ¶ 7, 73 P.3d 357. We recite the facts of this case accordingly.

¶ 4 Plaintiff Holly Wayment (Wayment) began working as a health reporter for a local television station, KTVX Channel 4, in Salt Lake City, Utah, on April 12, 1999. She originally signed a two-year written contract, which was extended until January 1, 2002.

After that date, the written contract expired, but Wayment continued working at KTVX as an at-will employee.

¶ 5 At the time Wayment was hired, KTVX was owned by United Television, Inc. In October 2001, the station was acquired by Clear Channel Broadcasting, Inc. Jon Fischer (Fischer) became the KTVX news director and Wayment's direct boss. Patrick Benedict (Benedict) was hired as the assistant news director and began work on May 1, 2002.

¶ 6 Wayment's job as KTVX health reporter involved giving on-air reports, between one and four minutes in length, on local or national health matters at least five days a week. Wayment also appeared in KTVX special reports on such topics as colon cancer, medical breakthroughs, summer safety, the AirMed helicopter ambulance, breast cancer awareness, and sleep anxiety. In 2001, she appeared in a half-hour special entitled, "The Truth About Tobacco." On at least one occasion, Wayment reported live from the Utah AIDS Foundation's local Oscar Night Gala during KTVX's evening newscast following the national Academy Awards broadcast. At least sixty-three of Wayment's stories mentioned the Huntsman Cancer Institute or its employees. During Wayment's employment, KTVX promoted her reports in fifteen- and thirty-second commercials.

¶ 7 In addition to her reporting activities, Wayment served on the board of directors of the local nonprofit organization Candlelighters for Childhood Cancer in 2001, participated in the Race for the Cure breast cancer research fundraiser in 2000 and 2001, spoke at the March of Dimes WalkAmerica fundraiser in 2001, and acted as Master of Ceremonies for the Utah Diabetes Center Gala in 2002.

¶ 8 Early in her employment with KTVX, after doing a story about a four-year-old girl with ovarian cancer, Wayment developed a relationship with the girl and her family. As a result, while the family was in Salt Lake City periodically for the girl's chemotherapy, Wayment would take the girl "to the ballet, the Sundance Institute, dinners and mov-

ies—anything to keep the little girl's mind off her cancer." This experience led Wayment to develop the idea of establishing a "buddy system" in the community, whereby Salt Lake residents would be paired with children being treated for cancer. To this end, she approached Dr. Joseph Yost, Director of the Center for Children at the Huntsman Cancer Institute (Huntsman), whom she knew as a result of her reporting activities. They discussed Wayment's idea informally.

¶ 9 Wayment first told her boss, Fischer, of her "buddy system" idea in early May 2002,[1] indicating that she had already approached Huntsman to suggest that it provide some form of support, and that Huntsman had responded favorably. Fischer reacted to this information with surprise and concern, telling Wayment that her solicitation of support for her project from Huntsman, a health care provider whose activities were at times covered by the media, "created a conflict of interest with her duties as a health reporter." Fischer then called Benedict into his office and asked Wayment to repeat what she had told him about her idea and her contact with Huntsman. Benedict agreed that Wayment's actions could create a "perception for bias," however unjustified. Fischer then told Wayment he would have to discuss this matter with his superiors.

¶ 10 On May 3, Fischer asked Wayment to submit a written statement to him, relating what she had told him. Later that day, Wayment sent Fischer the following e-mail:

As requested, here is more information about my efforts to help kids with cancer. It all began during my first year at ABC4 when, after doing a story on Tarrin, a four-year-old with ovarian cancer, I realized the need was there.

After getting to know her family, I learned that they drove twice a month for six hours up to Salt Lake for Tarrin to get her chemotherapy treatment. However, the family was financially strapped, so when Tarrin was not undergoing treatment they basically sat in their room at the

Ronald McDonald House and watched television.

I spent that next year, practically every week, doing an activity with Tarrin and/or her family. I found that many local organizations (i[.]e[.] the Ballet, the Sundance Institute) were eager to give free or low-cost tickets to families with cancer. I covered the cost for events that were not donated (i.e. dinners, movies, transportation). It began as a project to help a little girl keep her mind off her cancer. Then, when her cancer became terminal, it became a project to allow her to have experiences before she died. For example, Tarrin always wanted to be a ballerina. One month before her death, I took her to Ballet West's Nutcracker performance where we sat on the V.I.P. row. Tarrin was able to even go back stage during intermission and meet the prima ballerina.

One month later, I spoke at Tarrin's funeral and vowed I would work to help other children in her situation.

Since that time after much thought, and much feedback from friends, I have wanted to start a program where normal people in the community can help small children and their families battle this horrible disease. To gain experience and insight, I served on the Board of Candlelighters for Childhood Cancer. This is a group of people, who are mostly people who have had children with cancer, who serve as a support group for families. This group, however, does not provide a link to people in the community. Nor, is there an emphasis on activities.

Thus, through my work at ABC 4, I have gotten to know Dr. Joe Yost, the Director of the Center for Children at the Huntsman Cancer Institute. One day when we met for coffee (six months ago), I talked to him about my idea. As a doctor who works closely with children with cancer, he said a big part of getting over the disease is getting your mind off the disease. He loved the idea, and said this is definitely something the Intermountain

---

1. Wayment contends that this meeting took place on May 1 while Fischer and Benedict stated in their affidavits that it took place on May 3.

West needs. He loved the idea so much, he told me the Huntsman Cancer Institute Center For Children would like to be a part of it. He thought the group would be a big benefit to the kids treated there.

Since that time, Dr. Yost and I have talked on and off, and kept in touch through email. Three creative directors at local advertising agencies are volunteering their time to think of a name and logo—so that part of the project is being worked on right now. Some of the names being thought of are WonderKids, and KaliedaKids.

But basically, here's where we are: Huntsman Center For Children has agreed to run the program. A link could be provided on their web site. And, they have a secretary who could field calls. The Center also has nonprofit status with the government, a security screening program in place for volunteers, plus a solid base of volunteers wanting to help out in the community.

We would have most tickets donated for volunteers and families with cancer. But the Center would pay for fees not covered. An example of this would be covering the cost of a bus to take a group of children, volunteers, and a nurse to a play. Doctor Yost and I discussed that the fees the Center would cover would be minimal. The rest is based on donation and volunteer work. Hence, we also discussed that in no way does the Huntsman Cancer Institute expect special treatment from me because of my volunteer work with this group. Also, I do not expect to receive any special treatment from them.

This is simply what I see as a wonderful opportunity to help the thousands of children battling this insidious disease. I feel it is a way I can use my skills as a person, and a "local celebrity" for a good cause.

¶ 11 On May 14, 2002, Fischer informed Wayment that he had decided to fire her but that he would give her the option to resign instead. Wayment submitted her letter of resignation that day.

¶ 12 Shortly after her departure from KTVX, Wayment was told by a number of people, at the station and elsewhere, that they had heard she had been fired because she had received money from Huntsman and was using her reporter status in an attempt to "create a foundation." Subsequently, Wayment brought this defamation suit, alleging in her complaint that Clear Channel Broadcasting, Inc., through its agents Fischer and Benedict, had made "false accusations that [Wayment] was terminated because she was taking money from The Huntsman Cancer Institute, was in bed with the Institute and had used her reporting contacts to try to set up a foundation for her benefit."

¶ 13 Defendants Clear Channel Broadcasting, Inc., Fischer, and Benedict (collectively referred to as Clear Channel) requested summary judgment on the grounds that, first, Wayment was a public figure for purposes of her defamation action and had not demonstrated actual malice, as required under the First Amendment's public figure standard; second, the only evidence that Fischer made any of the statements at issue was inadmissible hearsay; and third, any statements attributable to Benedict were inadmissible because Wayment had failed to demonstrate the common law malice required to overcome the qualified privilege that protects employer-employee communications.

¶ 14 The district court agreed with Clear Channel that Wayment was a public figure. The court then concluded that Wayment was "unable to produce a single witness who directly heard defendant Fischer make any of the defamatory statements pled" and thus granted Clear Channel's summary judgment request with respect to Fischer. The court acknowledged that Wayment had produced one witness, Jeremy Castellano, who could testify that Benedict had made specific statements directly to him, thus "overcom[ing] the hearsay problem" with respect to Benedict. Nevertheless, the court granted summary judgment with respect to Benedict because "none of the statements Castellano heard defendant Benedict make are the defamatory statements which plaintiff has pled in her complaint." Based on these conclusions, without reaching Clear Channel's qualified privilege claim, the court dismissed Wayment's complaint with prejudice. Wayment

appealed. This court has jurisdiction pursuant to Utah Code section 78–2–2(3)(j) (2002).

## STANDARD OF REVIEW

■ ¶ 15 A district court "may properly grant summary judgment when 'there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.'" *WebBank v. Am. Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 10, 54 P.3d 1139 (quoting Utah R. Civ. P. 56(c)). We review a summary judgment determination "for correctness, granting no deference to the [district] court's legal conclusions." *Hansen v. AOL, Inc.*, 2004 UT 62, ¶ 6, 96 P.3d 950. "[W]e determine only whether the [district] court erred in applying the governing law and whether the [district] court correctly held that there were no disputed issues of material fact." *Kouris v. Utah Highway Patrol*, 2003 UT 19, ¶ 5, 70 P.3d 72.

## ANALYSIS

¶ 16 Wayment argues on appeal that, contrary to the district court's rulings, she does not qualify as a public figure, the evidence indicating Fischer made defamatory statements was not inadmissible hearsay, and the evidence indicating Benedict made defamatory statements sufficiently supported the allegations in her complaint. Clear Channel refutes each of these claims and also renews its argument that any employer-employee communications concerning Wayment's departure are protected by a qualified privilege. We address each of these issues in turn.

## I. WAYMENT'S PUBLIC FIGURE STATUS FOR PURPOSES OF HER DEFAMATION CLAIM

■ ¶ 17 The determination of a defamation plaintiff's public figure status is a question of law, reviewed for correctness. *See Rosenblatt v. Baer*, 383 U.S. 75, 88, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966); *Van Dyke v. KUTV*, 663 P.2d 52, 55 (Utah 1983). We

begin with an overview of the interests at issue in making this determination. We then identify the two categories of public figures and analyze whether Wayment fits within either of these categories.

### A. State and First Amendment Interests in Defamation Law

■ ¶ 18 "At its core, an action for defamation is intended to protect an individual's interest in maintaining a good reputation." *West v. Thomson Newspapers*, 872 P.2d 999, 1008 (Utah 1994); *see Seegmiller v. KSL, Inc.*, 626 P.2d 968, 973 (Utah 1981) (recognizing that "the integrity of an individual's reputation is essential to his standing in society, in his vocation, and even in his family").[2] Before 1964, defamation was a strict liability tort, and a plaintiff would recover from the publisher of a defamatory statement unless the publisher could prove the statement was true. *Id.* at 971 (noting that pre–1964 law "presumed damage to reputation from the defamation itself"); *see Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 334, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

¶ 19 The law changed, however, when the United States Supreme Court ruled in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), that state defamation law, like any governmentally sanctioned "formulae for the repression of expression," must be bound "by standards that satisfy the First Amendment." *Id.* at 269, 84 S.Ct. 710. The Court reasoned that the First Amendment protects " 'unfettered interchange of ideas for the bringing about of political and social changes desired by the people' " even though this interchange "may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials," and even though, in such a context, erroneous statements inevitably occur. *Id.* at 269–71, 84 S.Ct. 710 (quoting *Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957)). A strict liability rule in defamation law deprives

---

**2.** In order to state a claim for defamation under Utah law, a plaintiff must show "that defendants published the statements concerning him [either in print or by spoken words], that the statements were false, defamatory, and not subject to any

privilege, that the statements were published with the requisite degree of fault, and that their publication resulted in damage." *West*, 872 P.2d at 1007–08 (footnotes omitted).

the critic of official conduct of necessary "breathing space," *id.* at 271–72, 84 S.Ct. 710, by "compelling [him] to guarantee the truth of all his factual assertions," deterring some true speech along with the false, *id.* at 279, 84 S.Ct. 710. Concluding that the First Amendment essentially imposes a "federal rule" on state defamation law, the Court held that a "public official" could not "recover[ ] damages [under state law] for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80, 84 S.Ct. 710. In essence, the Court recognized a constitutional "privilege for the citizen-critic of government." *Id.* at 282, 84 S.Ct. 710; *see Madsen v. United Television, Inc.,* 797 P.2d 1083, 1084–85 (Utah 1990); *Van Dyke,* 663 P.2d at 54–55.

¶ 20 In *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), the Court extended this constitutional privilege to defamatory statements concerning "public figures" who are not government officials. *Id.* at 163, 87 S.Ct. 1975 (Warren, C.J., concurring in the result, joined by four Justices). The Court reasoned that, in the modern world,

> power has ... become much more organized in what we have commonly considered the private sector. In many situations, policy determinations which traditionally were channeled through formal political institutions are now originated and implemented through a complex array of boards, committees, commissions, corporations, and associations, some only loosely connected with the Government. This blending of positions and power has also occurred in the case of individuals so that *many who do not hold public office at the moment are nevertheless intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large.*

*Id.* at 163–64, 87 S.Ct. 1975 (controlling opinion of Warren, C.J.) (emphasis added); *see also id.* at 147–48, 87 S.Ct. 1975 (plurality)

("[A] rational distinction cannot be founded on the assumption that criticism of private citizens who seek to lead in the determination of ... policy will be less important to the public interest than will criticism of government officials." (internal quotation omitted)).

¶ 21 The Court in *Curtis* did not define precisely who should be considered a "public figure" for purposes of applying the constitutional privilege to state defamation law. In a subsequent opinion, *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Court indicated that the definition of "public figure" in effect rests on a judicial determination of the "proper accommodation" between First Amendment concerns and the state interest in compensating individuals for the harm caused by defamatory falsehood. *Id.* at 341–43, 94 S.Ct. 2997. The Court recognized that the state interest at issue was "strong and legitimate" with regard to private individuals. *Id.* at 348, 94 S.Ct. 2997. With regard to public figures, however, the state interest is reduced, in part because such individuals are able to engage in "self-help," counteracting defamatory statements through their own access to and use of "the channels of effective communication." *Id.* at 344, 94 S.Ct. 2997. Moreover, in most cases, such individuals "have voluntarily exposed themselves to increased risk of injury from defamatory falsehood" and are thus less deserving of state law protection than the average private person. *Id.* at 345, 94 S.Ct. 2997; *see Wolston v. Reader's Digest Ass'n,* 443 U.S. 157, 164, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979) (considering this "normative consideration" the more important of the two).

### B. "All-purpose" and "Limited-purpose" Public Figures

¶ 22 The Court recognized in *Gertz* that one might be deemed a public figure "on either of two alternative bases." 418 U.S. at 351, 94 S.Ct. 2997. First, "an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts." *Id.* These all-purpose public figures "occupy positions of such persuasive power and influence" that they may hold sway on any issue with which they

choose to become involved. *Id.* at 345, 94 S.Ct. 2997; *see Waldbaum v. Fairchild Publ'ns, Inc.,* 627 F.2d 1287, 1294 n. 15 (D.C.Cir.1980) (noting that truly famous figures "may be able to transfer their recognition and influence from one field to another" and that "[a] person's power to capitalize on his general fame by lending his name to products, candidates, and causes indicates the broad influence he has"). Second, and "[m]ore commonly," individuals who have "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved" become public figures "for [the] limited range of issues" associated with those controversies.[3] *Gertz,* 418 U.S. at 345, 351, 94 S.Ct. 2997. The overarching characteristic of either type of public figure—and the underlying rationale for the denomination—is that such a person has "assume[d] special prominence in the resolution of public questions." *Id.* at 351, 94 S.Ct. 2997.

¶ 23 Here, the district court ruled Wayment was a public figure but did not specify which type of public figure it deemed her to be. Clear Channel appears to suggest that Wayment, through her broadcast reporting activities and her public appearances at charitable events, has achieved a level of general fame in the Salt Lake community sufficient to qualify her for all-purpose public figure status.[4] Alternatively, Clear Channel argues that Wayment should at least be considered a limited-purpose public figure for purposes of her defamation suit. We address each of these possibilities in turn.

**3.** The *Gertz* Court also referred to the "[h]ypothetical[]" possibility of becoming an "involuntary" public figure "through no purposeful action of [one's] own," but the Court noted such a phenomenon "must be exceedingly rare." *Id.* at 345, 94 S.Ct. 2997; *see also id.* at 351, 94 S.Ct. 2997 (suggesting the possibility of being "drawn into a particular public controversy"). Some lower courts have referred to "involuntary public figures," either as a third category of public figures or as a subset of the limited purpose public figure category. *E.g., Wells v. Liddy,* 186 F.3d 505, 539–40 (4th Cir.1999); *Wilson v. Daily Gazette Co.,* 214 W.Va. 208, 588 S.E.2d 197, 208 (2003); *Wiegel v. Capital Times Co.,* 145 Wis.2d 71, 426 N.W.2d 43, 49 (1988) (citing Laurence Tribe, *American Constitutional Law* 880 (2d ed.1988)). However, since there is no assertion in this case that Wayment is an involuntary pub-

### C. Wayment Is Not an All-purpose Public Figure

¶ 24 The record before us fails to establish Wayment as a public figure for all purposes and in all contexts. The United States Supreme Court in *Gertz* emphasized that a court must "not lightly assume that a citizen's participation in community and professional affairs render[s] him a public figure for all purposes." 418 U.S. at 352, 94 S.Ct. 2997. Indeed, the United States Court of Appeals for the D.C. Circuit, in a widely-cited opinion, concluded that only "a well-known 'celebrity,' his name a 'household word,'" could appropriately be deemed an all-purpose public figure. *Waldbaum,* 627 F.2d at 1294 (stating further that the public "recognizes [such a person] and follows his words and deeds"). The requirements for attaining this status are strict, and few qualify. *See Lerman v. Flynt Distrib. Co.,* 745 F.2d 123, 137 (2d Cir.1984) (concluding that Jackie Collins Lerman, well-known author of "racy" novels, was not "that rare person the *Gertz* decision identifies as an all purpose public figure").

¶ 25 A defamation defendant who alleges the plaintiff is an all-purpose public figure must provide "clear evidence of [the plaintiff's] general fame or notoriety in the community, and pervasive involvement in the affairs of society." *Gertz,* 418 U.S. at 352, 94 S.Ct. 2997. Courts have suggested that such evidence might include "statistical surveys . . . that concern the plaintiff's name recognition," "[p]revious coverage of the plaintiff in

lic figure, we need not consider the possibility here.

**4.** In a post-hearing letter to the district court, Clear Channel acknowledged that "[i]f the comments about Ms. Wayment had related to her social life, her religious activities or to something else in her private life, she would concededly be a private figure. But, for the purposes of suing over statements about her very pervasive and highly public professional life as a well-known journalist, she is a public figure." In effect, Clear Channel appears to argue that Wayment is an "all-purpose" public figure only for limited purposes. However, such a contention misconstrues the requirements for each of these public figure categories, which are set forth below.

the press," "whether others in fact alter or reevaluate their conduct or ideas in light of the plaintiff's actions," and whether the plaintiff has successfully been able to "shun[ ] the attention that the public has given him." *Waldbaum*, 627 F.2d at 1295; *accord Wilson v. Daily Gazette*, 214 W.Va. 208, 588 S.E.2d 197, 205 (W.Va.2003) (holding that there was insufficient evidence to qualify a star high school athlete as an all-purpose public figure).[5]

¶ 26 The facts mustered by Clear Channel in support of Wayment's all-purpose public figure status are these: that Wayment "was the KTVX Channel 4 Health Reporter for three years," during which time she broadcast more than a thousand stories and a number of special reports and was featured in hundreds of KTVX promotional spots; that Wayment reported live from local health-related special events such as the Utah AIDS Foundation annual Oscar Night Gala; that Wayment participated in at least four public charitable events (the Utah Diabetes Center Gala, the March of Dimes WalkAmerica, and, twice, the Race for the Cure); that Wayment served on the board of the Candlelighters for Childhood Cancer; that Wayment referred to herself as a "local celebrity" in her email to Fischer; and that local newspapers covered Wayment's filing of the current lawsuit.

¶ 27 Most of these facts, however, simply demonstrate that Wayment was performing her job as a health reporter and that KTVX was advertising her reports in order to attract viewers to KTVX news broadcasts.[6] Whether Wayment actually considered herself a "local celebrity" or not,[7] her own opinion sheds little light on that of the public at large. Clear Channel has provided no evidence that Wayment wielded any particular social or political influence—no indication, for example, that members of the public tuned in to KTVX news or attended the four charitable events mentioned simply because of Wayment, nor that they attached more weight to her words or conduct, due to her alleged prominence, than they would to those of other reporters. Additionally, press coverage of a defamation lawsuit is generally disfavored as an indicator of the plaintiff's public figure status. *See Waldbaum*, 627 F.2d at 1295 n. 19 (noting that "[t]he court must examine [the facts supporting all-purpose public figure status] as they existed *before* the defamation was published" because otherwise, "the press could convert a private individual into a general public figure simply by publicizing the defamation itself and . . . litigation arising out of it" (emphasis added)).

¶ 28 If we were to accept these facts as sufficient evidence of general fame in the local community, any reporter would likely qualify as an all-purpose public figure. Clear Channel urges us to make such a blanket rule, arguing that other courts have consistently held media plaintiffs to be public figures. For this proposition, Clear Channel relies on *San Antonio Express News v. Dracos*, 922 S.W.2d 242 (Tex.App.1996), which held a television reporter to be a public figure without specifying the category of public figure to which he belonged.[8] *Id.* at

5. In many cases, it seems, true all-purpose public figures are so famous that a court might consider their status obvious. *See Eastwood v. Nat'l Enquirer, Inc.*, 123 F.3d 1249, 1251 (9th Cir.1997) (assuming without discussion that Clint Eastwood was a public figure); *Newton v. NBC, Inc.*, 930 F.2d 662, 668 n. 6 (9th Cir.1990) (noting that the district court had imposed a heavy fine on Wayne Newton simply for contesting his public figure status); *Buckley v. Littell*, 539 F.2d 882, 885–86 (2d Cir.1976) (reeling off a list of William F. Buckley, Jr.'s achievements so extensive that his public figure status could not be doubted).

6. According to Wayment, KTVX also encouraged its reporters to participate in local charitable functions as a means of increasing its own "market share."

7. We note that, according to Wayment, Fischer specifically requested that she refer to her use of her "celebrity" status in her written statement explaining her "buddy system" project. In any case, we certainly cannot consider her use of the term "celebrity," made before the alleged defamation occurred, a concession to treatment as a public figure in this defamation suit.

8. The only other case cited by Clear Channel in support of this assertion, *Cole v. Westinghouse Broadcasting Co.*, 435 N.E.2d 1021 (Mass.1982), is inapposite, as it conducts no public figure analysis and merely accepts a jury finding on this issue. *Id.* at 1022, 1024.

255. Even if the Texas Court of Appeals considered Dracos an all-purpose public figure, however, it did not do so based solely on Dracos's occupation as a journalist. The Texas court considered Dracos "more than a television journalist—he was a 'commentator' with a 'special' news segment" that was "highly accusatory in nature" and involved "put[ting public figures] on the rack." *Id.* at 253, 255. The court emphasized that Dracos had been "frequently featured in San Antonio newspapers" due to his highly provocative activities. *Id.* at 253. The evidence before the court included articles describing, for example, Dracos's unsubstantiated accusation that police officials were "playing golf during working hours" and his taking a wheelchair-bound woman excused from jury duty "to confront the judge." *Id.* at 253–54 (internal quotation omitted). Based on such evidence, the court may reasonably have concluded that Dracos had reached a high level of notoriety in his local community. There is no similar evidence before us regarding Wayment.

■ ¶ 29 The *Dracos* court noted that "journalists and television reporters ... have often been considered public figures." *Id.* at 252. However, the cases it cited as holding reporter plaintiffs to be public figures all qualified them as limited-purpose public figures. *See O'Donnell v. CBS, Inc.,* 782 F.2d 1414, 1417 (7th Cir.1986); *Falls v. Sporting News Publ'g Co.,* 714 F.Supp. 843, 847 (E.D.Mich.1989), *aff'd* 899 F.2d 1221 (6th Cir. 1990); *Adler v. Conde Nast Publ'ns, Inc.,* 643 F.Supp. 1558, 1565 (S.D.N.Y.1986); *Rybachek v. Sutton,* 761 P.2d 1013, 1014 (Alaska 1988); *Knudsen v. Kan. Gas & Elec. Co.,* 248 Kan. 469, 807 P.2d 71, 78 (1991); *Warner v. Kan. City Star Co.,* 726 S.W.2d 384, 385

(Mo.Ct.App.1987); *WFAA–TV, Inc. v. McLemore,* 978 S.W.2d 568, 573 (Tex.1998).[9] Because, as we discuss below, the determination that a defamation plaintiff is a limited-purpose public figure requires the identification of a particular public controversy, such a determination may not rest on the plaintiff's occupation alone. *See Straw v. Chase Revel, Inc.,* 813 F.2d 356, 361 (11th Cir.1987) ("[N]ot every publisher is automatically a public figure by virtue of his access to a printing press."); *Wilson,* 588 S.E.2d at 207 (rejecting defamation defendant's assertion that "all non-professional athletes are limited purpose public figures").

¶ 30 We therefore decline Clear Channel's invitation to hold Wayment a public figure simply because she is a television reporter and conclude that, in this case, the record fails to establish by clear evidence that Wayment is an all-purpose public figure.[10] We next consider whether Wayment is a limited-purpose public figure with regard to her current defamation action.

### D. Wayment Is Not a Limited-purpose Public Figure in the Absence of a Public Controversy

■ ¶ 31 As we discussed above, the Supreme Court in *Gertz* identified a limited-purpose public figure as someone who has "thrust [herself] to the forefront of [a] particular public controvers[y] in order to influence the resolution of the issues involved." 418 U.S. at 345, 94 S.Ct. 2997. The first step in analyzing whether a defamation plaintiff is a limited-purpose public figure for purposes of her defamation claim is to isolate the "particular public controversy" related to the defa-

---

9. We address these cases further when discussing whether Wayment is a limited-purpose public figure.

10. Even if it appeared that Wayment had in fact achieved fame in the local community as a result of her reporting activities, we would question the appropriateness of ruling her an all-purpose public figure in this context. The United States Supreme Court has held that a defamation defendant cannot, "by [its] own conduct, create [its] own defense by making the claimant a public figure." *Hutchinson v. Proxmire,* 443 U.S. 111, 135, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979). The

Court in *Hutchinson* was referring to the defendant's satirical grant of a "Golden Fleece Award" to the plaintiff as an assertion of wasteful government spending, which drew publicity to the plaintiff's previously obscure monkey behavior research. *See id.* at 115–17, 99 S.Ct. 2675. However, we think this rule must equally apply to the defendant's pre-defamation conduct, at least where, as here, the defendant was the plaintiff's employer throughout the period of the plaintiff's alleged fame and thus exercised a high degree of control over the plaintiff's professional activities.

mation.[11] If we are able to identify such a controversy, we then examine "the nature and extent of [the plaintiff's] participation" in that controversy in order to determine whether she has "thrust [her]sel[f] to the forefront of [the] controvers[y] in order to influence the resolution of the issues involved." *Gertz*, 418 U.S. at 345, 351–52, 94 S.Ct. 2997.[12]

▮▮▮▮▮ ¶ 32 In performing this analysis, we keep in mind the competing concerns underlying the public figure doctrine. Where a public controversy exists, there is a First Amendment interest in providing the breathing space necessary to ensure free debate on the issues involved. At the same time, unless the plaintiff has intentionally sought or attained a position of influence with respect to the particular controversy, and thus in some sense waived or rendered unnecessary the full protection afforded by state law, the First Amendment interest in providing breathing space for debate must yield, in part, to the strong state interest in providing a means of recovery from those who engage in defamation.[13]

¶ 33 Most cases holding a reporter to be a limited-purpose public figure have followed this approach. *See O'Donnell*, 782 F.2d at 1417 (holding that the head of a television station's editorial board was a limited-purpose public figure based on his "advoca[cy] of a particular point of view" in a controversy over EPA toxic waste burial regulations); *Adler*, 643 F.Supp. at 1565 (holding that a journalist plaintiff was a limited-purpose public figure based on her involvement in the controversy surrounding the magazine Vanity Fair's revival); *Rybachek*, 761 P.2d at 1014 (holding that a biweekly columnist was a limited-purpose public figure based on "the tone and substance of her column and the fact that [she] owned a gold mine herself" and held office in various miners associations, which indicated her involvement in controversies over Alaskan natural resources and mining issues); *Knudsen*, 807 P.2d at 78 (holding that a freelance investigative journalist was a limited-purpose public figure based on his initiating an investigative article on "the public's right to use Wolf Creek's cooling lake"); *WFAA–TV, Inc.*, 978 S.W.2d at 572 (holding that a reporter was a limited-purpose public figure based on his involvement in "[t]he controversy surrounding the [1993 failed ATF] raid" of the Branch Davidian compound in Waco, Texas).[14]

11. While other jurisdictions have adopted various tests for identifying a limited-purpose public figure, all recognize the public controversy requirement, and most consider it paramount. *See, e.g., Lundell Mfg. Co. v. ABC, Inc.*, 98 F.3d 351, 363 (8th Cir.1996) ("[W]e must first identify the particular public controversy giving rise to the defamatory speech."); *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1553 (4th Cir.1994) ("First, was there a particular 'public controversy' that gave rise to the alleged defamation?"); *Lerman*, 745 F.2d at 137 ("The difficult question is whether Ms. Lerman injected herself into a 'public controversy' related to the offending publication."); *Waldbaum*, 627 F.2d at 1296 ("As the first step in its inquiry, the court must isolate the public controversy."); *Warford v. Lexington Herald–Leader Co.*, 789 S.W.2d 758, 766 (Ky.1990) (requiring identification of a "particular and identifiable public controversy"); *Bowman v. Heller*, 420 Mass. 517, 651 N.E.2d 369, 374 (1995) ("Courts must determine if there is a public controversy....").

12. *See also Foretich*, 37 F.3d at 1553 (requiring that the plaintiff have "voluntarily assumed a role of special prominence in the public controversy" and have "sought to influence the resolution or outcome of the controversy"); *Lerman*, 745 F.2d at 136–37 (requiring that the plaintiff have "successfully invited public attention to his views in an effort to influence other[s] prior to the incident that is the subject of litigation" and "assumed a position of prominence in the public controversy"); *Waldbaum*, 627 F.2d at 1297 (requiring that the plaintiff have "purposely tr[ied] to influence the outcome [of the public controversy] or could realistically have been expected, because of his position in the controversy, to have an impact on its resolution," and indicating that "a court can look to the plaintiff's past conduct, the extent of press coverage, and the public reaction to his conduct and statements" in making this determination); *Warford*, 789 S.W.2d at 766–67 (requiring that the plaintiff have "by some voluntary act involve[d] himself [in the public controversy] to the extent that he either assumed a role of public prominence, or was in a position to influence others or the outcome of the controversy").

13. Of course, in accord with *Gertz*, 418 U.S. at 349, 94 S.Ct. 2997, a defamation plaintiff who is not a public figure must still establish negligence on the part of the defendant in order to recover damages. *Seegmiller*, 626 P.2d at 973.

14. The other two cases we have examined that have held journalists to be limited-purpose public

¶ 34 We now consider whether we can identify a particular public controversy giving rise to the alleged defamation in this case. Clear Channel offers two suggestions in this regard, referring first to the "public interest in assisting children who were terminally-ill with cancer" and second to the "great public interest in news reporter conduct" and media bias. However, neither of these suggestions identify a "public controversy" in the sense intended by *Gertz*.

■ ¶ 35 We agree with the vast majority of courts that have understood a "public controversy," in the context of limited-purpose public figure determinations, to be "not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." *Waldbaum*, 627 F.2d at 1296; *see also Lerman*, 745 F.2d at 138 ("A public 'controversy' is any topic upon which sizeable segments of society have different, strongly held views."). In other words, "persons actually [must have been] discussing some specific question. A general concern or interest will not suffice." *Waldbaum*, 627 F.2d at 1297. "If the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy."[15] *Id.*

¶ 36 Neither of Clear Channel's suggestions constitutes a "particular public controversy" in this sense. Certainly, the treatment of terminally-ill children and media bias both qualify as matters of public concern. However, in *Hutchinson v. Proxmire*, 443 U.S. 111, 135, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979), the Supreme Court made clear that a "public controversy" is a concept distinct from a "matter of public concern." The defamation plaintiff in *Hutchinson* had received government financing of his research, and the alleged defamation related to this financing. *Id.* In rejecting the public figure status of the plaintiff, the Court recognized the "concern about general public expenditures" but noted that this "concern is shared by most and relates to most public expenditures." *Id.* If relevance to such a concern were all that was necessary for someone to qualify as a public figure, "everyone who received or benefited from the myriad public grants for research could be classified as a public figure." *Id.* The Court considered this result undesirable because the " 'use of such subject-matter classifications to determine the extent of constitutional protection afforded defamatory falsehoods may too often result in an improper balance between the competing interests in this area.' " *Id.* (quot-

figures did so without identifying particular controversies. *Falls*, 714 F.Supp. at 847 (holding that a sports writer was "a public figure with regard to his sports writing activities"); *Warner*, 726 S.W.2d at 385 (holding that the editor of a newspaper's outdoor section was a limited-purpose public figure based on his "prominently featured articles" and his support of conservation causes). These opinions emphasized the plaintiff reporters' access to "the channels of effective communication" by virtue of their occupation as reporters. *Falls*, 714 F.Supp. at 847; *Warner*, 726 S.W.2d at 385. Since we believe the public controversy requirement is mandated by *Gertz* and also serves an important function in the accommodation between First Amendment and state interests, we decline to follow this approach. *See Foretich*, 37 F.3d at 1552 (recognizing that an individual's voluntary involvement in a public controversy is a "more important" consideration in the public figure analysis than is his access to the media); *Trotter v. Jack Anderson Enters., Inc.*, 818 F.2d 431, 436 (5th Cir.1987) (same).

15. Examples of issues that have been held to qualify as a "public controversy" are: "the Watergate controversy," *Wells*, 186 F.3d at 534; a

child-custody dispute that had received extensive media coverage "and [had] raised several substantial questions for public debate" before the alleged defamation occurred, *Foretich*, 37 F.3d at 1555–56 (holding, nevertheless, that the parents were not public figures because neither of them had "voluntarily assumed a role of special prominence" in the controversy); "the propriety of female or male nudity in films and in the print media generally," *Lerman*, 745 F.2d at 138; "the viability of cooperatives as a form of commercial enterprise and ... the wisdom of various policies that [the plaintiff company] was pioneering," *Waldbaum*, 627 F.2d at 1299; a county's "financially unsuccessful operation of its solid waste recovery facility and resulting strain on the county's resources and its taxpayers," *Mathis v. Cannon*, 276 Ga. 16, 573 S.E.2d 376, 381–82 (2002); "the AIDS epidemic, its victims' ordinary right to keep their medical records confidential, and the dangers to public servants who deal with AIDS victims," *Van Straten v. Milwaukee Journal Newspaper-Publisher*, 151 Wis.2d 905, 447 N.W.2d 105, 108 (1989); the controversy in a residential housing development over the qualifications of the development's general manager, *Martin v. Comm. for Honesty & Justice at Star Valley Ranch*, 2004 WY 128, ¶¶ 12–13, 101 P.3d 123.

ing *Time, Inc. v. Firestone*, 424 U.S. 448, 456, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976)).[16]

¶ 37 Here, in regard to the treatment of terminally-ill children, we see no evidence of any public controversy at all. It appears from the record that Wayment herself saw an unmet need in the current system of care, and her development of the "buddy system" idea and private communication with a Huntsman employee were intended to alleviate this need. Clear Channel alleges that Wayment aired "numerous stories" about "the plight of these children and their families" and that these stories generated "public interest and concern." However, the record refers to only one such story, that concerning Tarrin, which aired nearly three years before the alleged defamation occurred. There is no evidence that Wayment's story raised any debatable issues about the treatment of children with cancer or that the public was debating such issues immediately after the story aired, much less that any such debate continued three years later.

¶ 38 Likewise, Clear Channel has not pointed to any particular public controversy simply by stating that the public believes that media bias is undesirable. *Cf. Warford v. Lexington Herald–Leader Co.*, 789 S.W.2d 758, 767 (Ky.1990) (holding that issues concerning college athlete recruitment did not constitute a public controversy because "there was no legitimate controversy or debate about the desirability of NCAA rules violations"). Even assuming that Wayment's contact with Huntsman created a conflict of interest, an issue on which we express no opinion, there is no evidence of public debate over Wayment's activities prior to this litigation. Since Wayment was fired before she had actually gone through with her project and her plans were not publicized, it is difficult to imagine that any such debate occurred. We do not think the rumors circu-

lating among the employees at KTVX and other television stations amount to public debate.

¶ 39 Even if they did, however, we could not conclude that Wayment voluntarily thrust herself to the forefront of a controversy over her own or others' unethical activities. Such a conclusion would be equivalent to holding that any individual who engages in activities that attract public attention thereby injects himself into a public controversy over the conduct. The Supreme Court eschewed such a result in *Wolston*, refusing to hold the plaintiff a public figure based on his "failure to appear before the grand jury and citation for contempt" even though this behavior attracted significant media attention. 443 U.S. at 167, 99 S.Ct. 2701. The Court explained that the plaintiff did not "invite[ ] a citation for contempt in order to use the contempt citation as a fulcrum to create public discussion about the methods being used in connection with an investigation or prosecution." *Id.* at 168., 99 S.Ct. 2701 Because the plaintiff did not intend his action "to draw attention to himself in order to invite public comment or influence the public with respect to any issue," he was not a limited-purpose public figure. *Id.* Similarly here, nothing in the record even hints that Wayment sought to create a conflict of interest in order to stimulate public debate on such matters.

¶ 40 We therefore conclude that Wayment is a private figure for purposes of her defamation action. We proceed to address whether Wayment submitted sufficient evidence to support her claims that Fischer and Benedict made the statements at issue.

## II. SUFFICIENCY OF WAYMENT'S EVIDENCE OPPOSING SUMMARY JUDGMENT

■ ¶ 41 A party opposing a summary judgment motion may submit "depositions,

16. We believe such a result would also reinstate the rule suggested by a plurality of the Court in *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 52, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), which would extend the actual malice standard to any issue of "public or general concern." The Court in *Gertz* "repudiated this position," considering it too great an intrusion on a " 'legitimate state interest.' " *Time, Inc.*, 424 U.S. at 454, 96 S.Ct. 958 (quoting *Gertz*, 418 U.S. at 346, 94 S.Ct. 2997). We are aware that some states have

chosen to apply the actual malice standard whenever any matter of public concern is involved. *See Mount Juneau Enters., Inc. v. Juneau Empire*, 891 P.2d 829, 837 (Alaska 1995); *Diversified Mgmt., Inc. v. The Denver Post, Inc.*, 653 P.2d 1103, 1106 (Colo.1982); *Huggins v. Moore*, 94 N.Y.2d 296, 704 N.Y.S.2d 904, 726 N.E.2d 456, 460 (1999). However, we rejected this extension in *Seegmiller*, 626 P.2d at 973 & n. 1, and will not reconsider it here.

answers to interrogatories, or further affidavits" to refute the moving party's assertions by "set[ting] forth specific facts showing that there is a genuine issue for trial." Utah R. Civ. P. 56(e). In order to defeat the moving party's motion, the allegations contained in such submissions must be "admissible in evidence." *Id.* Summary judgment may thus not be denied based solely on inadmissible hearsay. *See Smith v. Four Corners Mental Health Ctr.,* 2003 UT 23, ¶¶ 50–51, 70 P.3d 904; *see also Norton v. Blackham,* 669 P.2d 857, 859 (Utah 1983) (statements that are "not ... admissible in evidence ... may not be considered on summary judgment under Rule 56(e)").

¶ 42 Here, Wayment relied on deposition testimony to oppose Clear Channel's summary judgment motion. As indicated above, the district court concluded that the only evidence in this testimony that Fischer made any of the alleged defamatory statements was inadmissible hearsay. The court recognized that Jeremy Castellano's deposition testimony regarding statements Benedict allegedly made to him was admissible nonhearsay.[17] The court nevertheless granted summary judgment with respect to Benedict as well as Fischer on the grounds that Benedict's statements, as reported by Castellano, did not match the defamatory statements alleged in Wayment's complaint.

¶ 43 Wayment now asks that we overturn the district court's rulings on both these points, arguing that the evidence of Fischer's defamatory statements is not hearsay, that Fischer's refusal to refute others' defamatory remarks is an adopted admission sufficient to defeat summary judgment with respect to Fischer, and that the evidence Benedict made defamatory statements is sufficiently similar to the statements alleged in Wayment's complaint. We address these arguments in turn.

### A. Wayment's Evidence Against Fischer Is Inadmissible Hearsay

■ ¶ 44 Whether proffered evidence meets the definition of hearsay in Utah Rule of Evidence 801 is a question of law, reviewed for correctness. *See, e.g., Carter v.*

*Univ. of Toledo,* 349 F.3d 269, 274 (6th Cir. 2003) (holding hearsay determination is a legal issue); *see also D.A. v. State,* 2002 UT 127, ¶ 8, 63 P.3d 607 (explaining that we generally consider the admissibility of evidence to be a question of law). Nevertheless, because application of the hearsay rules in a specific case is so highly fact-dependent, a district court's conclusions on such issues are entitled to some measure of deference. *See State v. Pena,* 869 P.2d 932, 938–39 (Utah 1994); *N.D. v. A.B.,* 2003 UT App 215, ¶ 11, 73 P.3d 971 (applying *Pena* to hearsay determinations); *State v. Webster,* 2001 UT App 238, ¶ 9, 32 P.3d 976 (same); *cf. Boren v. Sable,* 887 F.2d 1032, 1033 (10th Cir.1989) ("The need for deference to a trial court ruling on a hearsay objection is particularly great because the determination of whether certain evidence is hearsay rests heavily upon the facts of a particular case." (internal quotation omitted)).

¶ 45 Wayment points to the following deposition testimony as evidence that Fischer made the allegedly defamatory statements in question: (1) Adam Rodriguez's testimony that Fischer's secretary, M'Lissa Holt, told him that Fischer told her that Wayment was fired "because she was on the payroll with the Huntsman Institute"; and (2) Jeremy Castellano's testimony that Adam Rodriguez told him that M'Lissa Holt told him "that [Wayment] was receiving money from Huntsman and that she was on their payroll and that's why she was fired."

■ ¶ 46 Wayment asserts that the statement by M'Lissa Holt, referred to in both Rodriguez's and Castellano's testimony, is not hearsay because it is a representative admission by a party-opponent under Utah Rule of Evidence 801(d)(2)(D). We reject this argument. Rule 801(d)(2)(D) allows admission into evidence of an out-of-court statement by a party-opponent's agent or servant "concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Utah R. Evid. 801(d)(2)(D); *see State v. Worthen,* 765 P.2d 839, 847 (Utah 1988). Although Holt is an employee of Fischer and of Clear Channel,

---

17. Clear Channel does not dispute this holding on appeal.

there is no indication that Wayment's departure, or Fischer's alleged statements concerning the reasons therefor, fell within the scope of Holt's employment. *Cf. United States v. Portsmouth Paving Corp.,* 694 F.2d 312, 322 (4th Cir.1982) (holding a secretary's account of her employer's statement was admissible under federal rule 801(d)(2)(D) where, in the course of performing her job duties, she had relayed a message from her employer to an associate on the telephone); *McCallum v. CSX Transp., Inc.,* 149 F.R.D. 104, 110 (M.D.N.C.1993) ("[E]mployee comments on employment decisions will not bind the organization if the individual had nothing to do with the decision."). Significantly, Holt made the alleged statement to Rodriguez while outside the office on a cigarette break, not while carrying out any aspect of her job. Rule 801(d)(2)(D) therefore does not apply.

¶ 47 Since Holt's statement does not qualify as a representative admission, Wayment's only purpose in offering Rodriguez's and Castellano's testimony on this point is to prove the truth of Holt's statement that Fischer told her Wayment had received money from Huntsman. The testimony thus meets the definition of hearsay,[18] and Wayment suggests no applicable exception that would render it admissible.

### B. Wayment's Defamation Claim Is Not Supported by Fischer's Alleged Adopted Admission

¶ 48 Wayment also points to Fischer's testimony that he knew there were false rumors in the newsroom that Wayment had accepted money from Huntsman but had remained silent regarding the actual reasons for Wayment's departure. Wayment claims that Fischer's failure to refute newsroom rumors constitutes an adopted admission under Utah Rule of Evidence 801(d)(2)(B) and therefore serves as admissible evidence that Fischer is liable for defamation.

¶ 49 This argument, however, misconstrues the operation of this evidentiary rule. Rule 801(d)(2)(B) excludes from the definition of hearsay a statement that is of-

fered against a party who "has manifested an adoption or belief in its truth." Utah R. Evid. 801(d)(2)(B). Failure to contradict someone else's statement may, in some circumstances, constitute an adopted admission. *See State v. Carlsen,* 638 P.2d 512, 514 (Utah 1981) (holding that a criminal defendant's silence while someone else indicated his involvement in a criminal act constituted an adopted admission); *see also United States v. Ward,* 377 F.3d 671, 675–76 (7th Cir.2004) ("[A] statement may be adopted as long as the statement was made in the defendant's presence, the defendant understood the statement, and the defendant has the opportunity to deny the statement but did not do so.").

¶ 50 Here, arguably, Fischer's silence in the face of newsroom rumors may be admissible into evidence as an adopted admission under rule 801(d)(2)(B). Even if so, however, such evidence would not suffice to sustain Wayment's defamation claim with respect to Fischer because an individual's adopted admission of an allegedly defamatory statement does not equate to the individual's own publication of the statement, an essential element of a defamation cause of action. Wayment argues that such an adopted admission constitutes circumstantial evidence that Fischer made such statements himself. We disagree. The inferential leap from Fischer's failure to refute rumors, on the one hand, to his active initiation of or participation in these rumors, on the other, is too great. We therefore uphold the district court's grant of summary judgment with respect to Wayment's claims against Fischer.

### C. Wayment Submitted Sufficient Evidence to Defeat Summary Judgment with Respect to Benedict

¶ 51 As described above, the district court viewed the statements that, according to Castellano's deposition testimony, Benedict made directly to Castellano, to be too unlike those alleged in Wayment's complaint to avoid summary judgment. We perceive no

---

18. Hearsay is an out-of-court statement that is "offered in evidence to prove the truth of the matter asserted." Utah R. Evid. 801(c).

such difficulty. According to Castellano, Benedict told him that Wayment "abused her contacts as a reporter to start this foundation and she was in charge of a large sum of money and it's unethical." Castellano further reported that Benedict said: "You can't do stories on a place that you receive money from." This formulation appears essentially similar to, if less detailed than, the allegation contained in Wayment's complaint that Benedict "made false accusations that [Wayment] was terminated because she was taking money from The Huntsman Cancer Institute, was in bed with the Institute and had used her reporting contacts to try to set up a foundation for her benefit." We therefore reverse the district court on this issue and overturn its grant of summary judgment with respect to Benedict.

### III. QUALIFIED PRIVILEGE FOR EMPLOYER–EMPLOYEE COMMUNICATIONS

¶ 52 Clear Channel urges us to uphold the district court's summary judgment ruling with respect to Benedict, even if we disagree with the court's reasoning, on the alternative theory that Wayment failed to produce evidence that Benedict acted with common law malice. Clear Channel argues that evidence of common law malice is required to overcome the qualified privilege that, it asserts, protected any communications between Benedict and Clear Channel employees in which Benedict made defamatory statements.

¶ 53 "Whether a publication is conditionally privileged is a question of law ..., unless a genuine factual issue exists regarding whether the scope of the qualified privilege has been transcended or the defen-

dant acted with malice." *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 58 (Utah 1991). Evidence of "malice" in this context may include indications that the publisher "made [the statements] with ill will, [that the statements] were excessively published, or [that the publisher] did not reasonably believe his or her statements." *Russell v. Thomson Newspapers, Inc.*, 842 P.2d 896, 905 (Utah 1992); *see also Combes v. Montgomery Ward & Co.*, 119 Utah 407, 228 P.2d 272, 275 (1951) (relying on authority requiring the employer to have " 'an honest belief in the truth of the statement' " (quoting *Harrison v. Garrett*, 132 N.C. 172, 43 S.E. 594, 596 (1903))); *Hales v. Commercial Bank*, 114 Utah 186, 197 P.2d 910, 913 (1948) (" 'The publisher's lack of belief in the truth of the defamatory matter published, or his lack of reasonable grounds for so believing, while immaterial to the existence of the privileged occasion, is important as constituting an abuse of the occasion which deprives him of the protection which it would otherwise afford.' " (quoting Restatement of Torts § 594 cmt. b (1938))).[19]

¶ 54 Here, we believe the record contains sufficient evidence to raise a genuine issue of fact regarding whether Benedict reasonably believed in the truth of his communication, assuming it occurred.[20] Accordingly, we decline Clear Channel's invitation to apply the employer-employee qualified privilege as an independent basis for affirming the district court's ruling with respect to Benedict.

### CONCLUSION

¶ 55 We hold that Wayment is not a public figure for purposes of her defamation claim. Clear Channel has failed to provide sufficient evidence that Wayment has achieved a level

---

19. Clear Channel correctly points out that the concept of "malice" here is distinct from the "actual malice" required under the First Amendment for public figures. While "[a]ctual malice refers to the constitutionally mandated level of fault necessary in public figure cases," malice in the context of a conditional privilege "is simply a means of determining when the privilege ... is forfeited." *Russell*, 842 P.2d at 904; *see Brehany*, 812 P.2d at 59; *Cox v. Hatch*, 761 P.2d 556, 559 n. 3 (Utah 1988). Contrary to Clear Channel's understanding, however, proof of knowledge of or reckless disregard for a statement's falsity would satisfy either standard. *See* Re-

statement (Second) of Torts § 600 (1977) (providing that knowledge of or reckless disregard for a statement's falsity constitutes an abuse of a conditional privilege). While in the public figure context, such proof demonstrates the required level of fault, the same proof serves in the privilege context to demonstrate the publisher's "hostility or ill will," *Brehany*, 812 P.2d at 59.

20. Of course, whether Benedict actually made the alleged statement is also a disputed factual matter.

of renown sufficient to be considered an all-purpose public figure. In addition, Wayment does not qualify as a limited-purpose public figure because there is no indication that Wayment has attempted to influence the outcome of a public controversy germane to the alleged defamation.

¶ 56 We affirm the district court's summary judgment ruling with respect to Wayment's allegations against Fischer because Wayment has failed to provide admissible evidence that Fischer made any of the alleged defamatory remarks in question. However, we reverse the district court's ruling with respect to Wayment's allegations against Benedict because her evidence that Benedict made the alleged remarks is sufficient to defeat summary judgment, and because we reject the defendants' qualified privilege claim as an independent ground for affirmance. Clear Channel thus also remains a party to this suit as Benedict's principal. We remand to the district court for further proceedings consistent with this opinion.

¶ 57 Associate Chief Justice WILKINS, Justice DURRANT, Justice PARRISH, and Justice NEHRING concur in Chief Justice DURHAM's opinion.